CAMPUS SWEATER AND SPORTS-WEAR COMPANY, Plaintiff,

v.

M. B. KAHN CONSTRUCTION COMPANY: Fort Roofing and Sheet Metal Works, Inc., and Celotex Corporation, Defendants.

Civ. A. No. 76–0292–5.

United States District Court, D. South Carolina, Columbia Division.

Sept. 28, 1979.

G. Thomas Cooper, Jr., West, Bendorf, Cooper & Bowen, Camden, S. C., Terrell Glenn, C. Alan Runyon, McNair, Glenn, Konduros, Corley, Singletary, Porter & Dibble, P. A., Columbia, S. C., for Campus Sweater and Sportswear Co.

Harry C. Wilson, Jr., Nash & Chappell, Sumter, S. C., Donald V. Richardson, Richardson, Plowden, Grier & Howser, Columbia, S. C., for Fort Roofing & Sheet Metal Works, Inc.

Robert W. Herlong, Barnes, Austin & Ellison, Charles E. Hill, Turner, Padget, Graham & Laney, Columbia, S. C., for M. B. Kahn Construction Co.

John Gregg McMaster, Tompkins, McMaster & Thomas, Columbia, S. C., James A. Eichelberger, John D. Jones, Greene, Buckley, DeRieux & Jones, Atlanta, Ga., for Celotex Corp.

## ORDER

HEMPHILL, District Judge.

This court has before it for decision the motions of defendant Celotex Corporation ("Celotex") for judgment notwithstanding the verdict (n. o. v.) or, in the alternative, for an order for a new trial. The motions arise out of a "products liability" action brought by plaintiff which alleged, among other causes of action, fraud and gross negligence on the part of Celotex in marketing commercial roofing materials. After 12 days of testimony, a jury awarded Campus Sweater and Sportswear Company ("Campus") $208,000.00 in actual damages and $500,000.00 in punitive damages on the claims against Celotex. The jury also awarded defendant Fort Roofing ("Fort") $125,000.00 in punitive damages on Fort's cross claim against Celotex for fraud and gross negligence.[1] Celotex claims the evidence does not support the verdict, that punitive damages should not have been awarded, and that a mistrial should have been declared. For the reasons which will appear at length in this opinion, the motions for judgment n. o. v. and a new trial are denied and the jury awards of punitive damages against Celotex are affirmed in toto. However, the award of compensatory (actual) damages to Campus must be reduced as hereinafter explained.

## INTRODUCTION AND BACKGROUND

Plaintiff instituted this action in the United States District Court for the District of South Carolina on February 17, 1976.[2] The original complaint alleged and the answers admitted the complete diversity of the parties under 28 U.S.C. § 1332(a).[3] Although the parties have raised some issues which arise under the Constitution of the United States, jurisdiction will not lie under 28 U.S.C. § 1331[4] since no federal question appears on the face of the well-pleaded complaint in this action. *Louisville & N. R. Co. v. Mottley,* 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908); *Gold Washing & Water Co. v. Keyes,* 96 U.S. 199, 24 L.Ed. 656 (1877). It appears that Campus is an Ohio corporation with its principal office located in Cleveland, Ohio. Defendant M. B. Kahn Construction Co. ("Kahn") is a South Carolina corporation with its principal office in Columbia, South Carolina; defendant Fort is a South Carolina corporation, with its principal office in Sumter, South Carolina; while defendant Celotex is a Florida corporation doing business in the State of South Carolina.

Due to the number and complexity of the issues raised in these motions, it will be necessary to postpone a full discussion of the facts until such time as each issue is treated separately. However, the testimony will confirm that this action revolves around the development and sale of a Bond Ply roofing system, and a brief history of the context in which this action arose may be helpful as an introduction.

At some undisclosed point in time, but well before 1963, the Barrett Company, a

1. The use of the term "gross negligence" throughout this order is merely one of convenience. The jury was carefully instructed on the appropriate conduct necessary before punitive damages could be assessed—that of "conscious indifference" to or "gross disregard" of the rights of another. Transcript at 2461–62. *Hicks v. McCandlish,* 221 S.C. 410, 415, 70 S.E.2d 629, 631 (1952). Accord, *Stonehocker v. General Motors,* 587 F.2d 151, 158 (4th Cir. 1978).

2. An amended complaint was filed February 28, 1977 introducing new causes of action.

3. 28 U.S.C. § 1332(a) provides: Diversity of Citizenship
 (a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and is between—
 (1) citizens of different states; . . . .

4. 28 U.S.C. § 1331(a) provides: Federal Question; Amount in Controversy; Costs
 (a) The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States except that no such sum or value shall be required in any such action brought against the United States, any agency thereof, or any officer or employee thereof in his official capacity.

long respected member of the roofing manufacturing community, in business since the 1850s, was purchased by Allied Chemical Company and thereafter became known as the Barrett Division of Allied Chemical Company. As such, it continued to manufacture roofing products. During 1963, Barrett began making certain tests[5] to determine whether two plies of coated saturated felt material might be successfully employed as a built-up roof membrane instead of the then-traditional four-ply roof membrane.[6]

In 1963, coated felts had been used for many years as a "base sheet", i. e., the very first sheet applied in the construction of certain types of commonly used roofing membranes. Hence, there was nothing new or unique about the use of a coated felt as a part of a roofing system. What was to be new or unique, however, was the use of *two* of these coated sheets instead of the traditional *four* unsaturated felt sheets in installing the new system, as it was envisioned in 1963. In 1963, three test roofs were built[7] whose significance is disputed. Celotex admits the primary purpose was to determine how well the system "plied", that is, how easily it could be applied to the roof.[8] Campus and Fort contend these tests had nothing to do with the life expectancy of the roof,[9] while Celotex contends that the roofs performed well insofar as the roofers were concerned.[10] After approxi-

mately one year of such testing, the Barrett Division decided to market a roofing system to consist of two plies of coated sheets, which it would specify and offer to bond for a term of 20 years just as it had the four-ply system. The coated sheets employed in this new system, while essentially the same as the coated base sheets which had been marketed for years, were given the name "Bond Ply". The two-ply membrane to be specified, which consisted of two Bond Ply sheets, was known as the "Bond Ply System".

Inasmuch as the two-ply roofing system constituted a major deviation from roofing tradition, opinions were not unanimous, even within Barrett, as to the merits of the system. Upon assurance from the Research Department that the system was workable, Barrett decided to market the Bond Ply system as a 20-year roof. Yet, the head of research, Mr. Donegan, cautioned, "We have no service basis on which to recommend a construction as simple as this for a 20-year period".[11] Barrett also knew at this time, that the tensile strength of the Bond Ply system was one-half as strong as a conventional roofing system.[12] However, no standards as to felt strength existed at the time and the importance of felt strength was uncertain. In early 1963, when Barrett decided to market the system, one of Barrett's largest competitors, Johns-

**5.** Deposition of Erskine Franklin, an executive of Celotex, was read into the record, Transcript at 2006–08. The exact nature of these tests is discussed *infra* at 87.

**6.** The term "membrane" is used to designate, collectively, all the felt plies of a roof together with a mopping coat of asphalt directly beneath and between them, and the flood coating of asphalt or tar applied on top. The term "coated felt" designates *a sheet of roofing felt saturated with asphalt, to the top and bottom of which a uniform thickness of asphalt coating is applied at the factory.* Hence, in a "coated felt" as the term is used herein, the asphalt-saturated felt is sandwiched between a factory-applied coating of asphalt. Deposition of Erskine Franklin, Transcript at 2028–29.

**7.** Testimony of Robert S. Dugger (Barrett's Regional Manager of Built-up Roofing who handled the technical aspects such as application,

issuing bonds, and handling complaints), Transcript at 2103–2104.

**8.** *Id.*, Transcript at 2104–2105.

**9.** *Id.*, Transcript at 2155.

**10.** Testimony of Dugger, Transcript at 2105.

**11.** Plaintiff's exhibit 126, Inter-office memo, dated October 22, 1963, from Donegan (head of research) to E. N. Franklin of the Marketing Department, also said, "As to the more important criterion, anticipated life, we have no service basis on which to recommend a construction as simple as this for a 20 year period."

**12.** Plaintiff's exhibit 114, Inter-office memo, dated September 13, 1965, from Rissmiller (technical-research) to Donegan (research) reports confusing figures.

Manville, was rejecting a two-ply system as being unsound.[13]

After one year of testing the ease of application of the "Bond Ply System", Barrett decided to place the system on the market without determining if the Bond Ply roof would last 20 years. There was in existence at that time a device known as a "weatherometer" whose function was to test the weatherability of a roof, and thus its longevity, by "weathering" it in an exaggerated fashion to simulate extended periods of time.[14] It is possible this device could have been used to test the Bond Ply life expectancy, although some witnesses were not sure of its applicability to commercial roofs. Either this test was not made or its results were unreported. Once on the market, Bond Ply became the most profitable roofing system in Barrett's line, and as a result, salesmen were awarded bonus points for selling this system in lieu of others.[15]

The two-ply system, which was included in the Barrett Roofing Manual of Specifications for 1964, was promoted as the functional equivalent of a four-ply uncoated saturated felt roof system. Barrett offered a 20-year bond upon such a roof[16] built in accordance with its specifications. In advertisements and brochures,[17] Barrett pointed out that such a roof would be more economical to install, that a roof constructed of coated felt sheets would be more weather-tight as the individual sheets were going on, that a coated sheet would withstand foot traffic better than a saturated felt sheet before the top flood coating was applied, and that a roofer would have a greater margin for error by using the two coated sheets.

As sales began to climb, complaints of roof problems also started coming into Celotex,[18] which had purchased the Barrett Division of Allied Chemical in 1967. Mr. Rissmiller, a researcher, was assigned full time to investigate Bond Ply complaints. As early as 1965, Mr. Franklin had predicted that unless the problems of Bond Ply were solved, sales would slowly diminish to insignificance.[19] Celotex knew of these problems and plaintiff and Fort theorized that Celotex attempted to solve the problems without letting its customers know of them[20] in order to maintain its sales, profit and market advantages. Whether this was a case of isolated complaints arising from the use of thousands of roofs, or whether there were sufficient complaints that warnings should have issued, was a matter in dispute. At the same time that Celotex [Barrett] issued a brochure, received by Fort, implying that the performance of a Bond Ply system was as good as that of a four-ply system,[21] Franklin was asking research to make a comparison of the two systems.

Meanwhile, Campus had been developing a manufacturing and distribution center in Chester, South Carolina, with the assistance of the Chester County Development Authority. In 1968, Campus decided to erect

13. Testimony of Robert M. Stafford, former employee of Johns-Manville Transcript at 1252–3, 1278–80.

14. Testimony of E. N. Franklin, at that time in charge of stimulating the introduction of new products into the market, Transcript at 2078–9.

15. Testimony of Rissmiller of Celotex, Transcript at 621; Deposition of Erskine Franklin, Celotex director of marketing, Transcript at 2022–2024.

16. Testimony of Walter Butterfield (Barrett-Celotex Research), Transcript at 1075.

17. This statement was on Page 5 of defendant's brief (which was not annotated to the Transcript).

18. Proof was allowed under the directions of *Gardner v. Q.H.S.*, 448 F.2d 238 (4th Cir. 1971); see discussion *infra* at 46–55.

19. Plaintiff's Exhibit 162, Inter-office memo from Franklin to Donegan, dated December 22, 1965.

20. Testimony of John J. McClellan, Celotex salesman, Transcript at 1827.

21. The brochure was referred to as, "One Plus One Equals Four" which implied that two sheets of Bond Ply were the equivalent of a Four-Ply system. It was introduced as Fort Exhibit SSS.

an addition to its warehouse facilities in Chester. Pursuant to an arrangement worked out for bookkeeping and tax reasons, the Chester County Development Authority was the actual signatory on the contract with the general contractor, Kahn.[22] In actuality, it was the intention of Campus and the Development Authority that the building was to be built for Campus and in accordance with the specifications submitted by Campus. The contract was signed by Campus' chief engineer, Bernard Zuckerman, on behalf of the Development Authority. However, under the contract, Campus had an option to buy the building after 10 years.

The roof specified in the original contract was never built. The contract with Kahn called for "a four-ply coal tar pitch and gravel, 20-year roof over insulation." However, Kahn's Vice President, Mr. Strauss, was contacted about this time by a Celotex sales representative, Mr. McClellan, who brought "data" to him concerning a proposed change from a four-ply, tar-and-gravel roof to a two-ply, Bond Ply roof.[23] This information was forwarded by letter to Mr. Zuckerman of Campus,[24] who then instructed his assistant, Mr. Heppert, to investigate what the Celotex catalog said about the Bond Ply roof.[25] Mr. Heppert was initially dubious of the existence of a two-ply 20-year roof, but his inspection of the Celotex catalog revealed that there was a 20-year bondable roof made of two plies.[26] Heppert then made some calculations concerning the amount of asphalt or tar in the roof and came to the conclusion that the amount of asphalt or tar used was roughly comparable to that in a conventional four-ply roof. Based on the catalog, his investigations, and the good reputation of the Barrett Company, Mr. Heppert reported to Mr. Zuckerman that "sure enough, there is such a roof".

Having reached the conclusion that the Bond Ply roof apparently met Campus' specifications, Mr. Zuckerman authorized the change from a four-ply to a Bond Ply roof.

Kahn subcontracted with Fort who built the roof using the material sold to them by Celotex. Fort was an approved roofer for Barrett and Celotex, who were very selective about roofing contractors. However, there was no evidence that Fort as an "approved roofer" was ever told of the complaints or possible limitations of the Bond Ply system. In 1972, Celotex removed the Bond Ply product from most of its markets, and in 1973 Celotex did not list Bond Ply in the roofers' manual.[27]

The roof in question began to leak in 1973,[28] and the leaks became progressively more numerous and more serious. In 1974, Campus purchased the building in question from the Chester County Development Authority, and in February, 1976, filed the instant lawsuit, shortly before it replaced the roof in question.

In its lawsuit, Campus charged negligence on Kahn's part in not having properly supervised subcontractor Fort thereby permitting the latter to indulge in certain specified negligent practices which allegedly contributed to the roof failure. Kahn was further charged with breach of implied warranty and breach of express warranty. During the course of the trial, on motion properly made, this court dismissed Campus' negligence and express warranty claims against Kahn and at the conclusion of all evidence, Campus voluntarily suffered a dismissal of its implied warranty claim against Kahn.

Campus alleged that Fort was negligent in leaving roofing materials exposed to the

22. Testimony of Bernard Zuckerman, Vice President of Engineering and Chief Engineer of Campus, Transcript at 87–8.

23. Testimony of Werner Strauss, Vice President of Kahn, Transcript at 1626–7.

24. Testimony of Marion Heppert, Zuckerman's assistant, Transcript at 403–5.

25. *Id.*, Transcript at 405.

26. *Id.*, Transcript at 406–8.

27. Deposition of Franklin, Transcript at 2040, 2074–75.

28. Testimony of Zuckerman, Transcript at 120.

elements, in failing to apply roofing materials in accordance with the Celotex specification, and in allowing insulation to become wet by exposure overnight. Upon conclusion of plaintiff's evidence, this court dismissed Campus' complaint against Fort, but left intact Fort's cross-claim against Celotex.

Campus charged that Celotex was guilty of negligence in placing its Bond Ply system on the market in 1964 without previously having conducted adequate tests. Campus further alleged that Celotex was on notice that problems, such as were experienced by Campus, should have been anticipated because Celotex had allegedly received similar prior complaints. Hence, it was charged that Celotex had a duty to warn Campus, which it failed to do. Campus also alleged fraud in that Celotex allegedly made representations which it knew or should have known were false, and that Campus was entitled to punitive damages as a result. Further contentions by Campus were that Celotex had breached its express warranty of longevity and implied warranties as to the suitability of the roof. The implied warranty action was dismissed at the close of the evidence.[29]

Kahn filed an indemnity cross-claim against Fort alleging that, if Kahn were held liable, its liability would have to be predicated upon Fort's errors and omissions. The Kahn cross-claim became moot when Kahn and Fort were relieved of any liability to plaintiff.

In its answer Fort also incorporated a cross-claim against Celotex, contending that Celotex was liable for fraud in that it had represented to Fort that the Bond Ply system was better than others used by Fort and that Fort had relied upon such representation. Fort claimed that Celotex had not properly tested the system, that those tests which were conducted had given poor results and that Celotex had maintained poor quality control.

Celotex denied substantially all of the material allegations of Campus' complaint and of Fort's cross-claim. It additionally asserted affirmative defenses which included the statute of limitations and a motion to dismiss premised upon the contention that plaintiff was not the real party in interest.

The trial was a mammoth and complex event. The transcript of 12 days of testimony runs 2500 pages, hundreds of exhibits were introduced or identified, and the number of objections raised were more than this court has ever experienced in over 40 years of law practice and service on the bench. Aware that the attorneys were trying to protect their clients and also aware of the effect which numerous objections may have on a jury, this court attempted to protect advocates and their clients by hearing most objections out of the presence of the jury. Furthermore, the parties were allowed to interject general objections, rather than to argue in front of the jury each time something they perceived as objectionable was sought to be introduced into evidence. This court feels this technique was especially effective in light of Celotex's numerous objections to the introduction of documents relating to similar complaints. Instead of having to remove the jury every five minutes when evidence was sought to be introduced, this court took note of Celotex's general objection and allowed Celotex's attorneys to interject any specific objections which they might have at that time. As a result, this court perceives that any distractions and irritations to the jury were held to a minimum.

The verdicts were returned by the jury after a day of deliberation. The jury found that Celotex had breached an express warranty to Campus, that it had perpetrated a fraud on defendant Fort, that Celotex was negligent in testing or failing to test its product before putting it on the market, that Celotex was guilty of a conscious disre-

---

**29.** Although alleged, no action under § 402A of the Restatement of Torts, Second, codified as § 15–73–10 *et seq.* of the Code of Laws of South Carolina, 1976, was prosecuted due to this court's ruling in a previous action, *Cox v. Harley-Davidson Motor Co.*, Civil Action No. 75–0320 (filed April 14, 1975), that § 15–73–10 was not retroactive.

gard of a duty in testing or failing to test its product before putting it on the market, and that Celotex had perpetrated a fraud on Campus. The jury found the plaintiff damaged in the amount of $208,000.00 and proceeded in addition to award the plaintiff $500,000.00 in punitive damages. Fort Roofing and Celotex had previously stipulated that Fort need not prove actual damages. Therefore, the jury was instructed that it might find actual damages in any amount and that punitive damages could be assessed regardless of the amount of actual damages found. The jury proceeded to award no actual damages and $125,000.00 in punitive damages. This court entered judgment in accordance with the jury verdict and the motions which are the subject matter of this opinion followed.

## STANDARDS FOR CONSIDERATION OF MOTION(S) FOR A JUDGMENT NOTWITHSTANDING THE VERDICT (N.O.V.), OR, IN THE ALTERNATIVE, FOR A NEW TRIAL

■ Defendant Celotex's motion for judgment n. o. v. under Rule 50(b), Federal Rules of Civil Procedure, has the effect of renewing its motion for a directed verdict made during trial.[30] The standards for granting the motions are identical, as Celotex is simply asking this court to reconsider its decision not to direct a verdict in favor of Celotex. See Wright & Miller, *Federal Practice and Procedure,* § 2537 (West Publishing Co., 1978). Since the question presented by a motion for judgment n. o. v. is whether there are any reasonable grounds to support the jury's verdict, the evidence must be viewed in the light most favorable to the non-moving parties (Campus and Fort). Furthermore, those parties are entitled to the benefit of all inferences which the evidence reasonably supports, even though contrary inferences might reasonably be drawn. *Scavens v. Mack Stores, Inc.,* 577 F.2d 870, 873 (4th Cir. 1978); *Butler v. O/Y Finnlines, Ltd.,* 537 F.2d 1205, 1206–07 (4th Cir.), *cert. denied,* 429 U.S. 897, 97 S.Ct. 260, 50 L.Ed.2d 180 (1976); *Howard v. McCrory,* 601 F.2d 133 (4th Cir. 1979).

■ The alternative motion for a new trial is apparently based upon Rule 59(a), which employs a less rigorous standard than Rule 50(b) since the finality intrinsic to a judgment is not found in Rule 59(a).[31] Judge John J. Parker, speaking for the Fourth Circuit in 1932, drew the distinction between these two motions in an oft-quoted passage:

> There seems to be some confusion on the part of counsel as to the difference between the duty to direct a verdict and the duty to grant a new trial after verdict;

**30.** Fed.R.Civ.P. 50(b) reads as follows:

Whenever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. Not later than 10 days after entry of judgment, a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict; or if a verdict was not returned such party, within 10 days after the jury has been discharged, may move for judgment in accordance with his motion for a directed verdict. A motion for a new trial may be joined with this motion, or a new trial may be prayed for in the alternative. If a verdict was returned the court may allow the judgment to stand or may reopen the judgment and either order a new trial or direct the entry of judgment as if the requested verdict had been di-

rected. If no verdict was returned the court may direct the entry of judgment as if the requested verdict had been directed or may order a new trial.

**31.** Fed.R.Civ.P. 59(a) reads as follows:

A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States; and (2) in an action tried without a jury, for any of the reasons for which rehearings have heretofore been granted in suits in equity in the courts of the United States. On a motion for a new trial in an action tried without a jury, the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment.

and the contention is frequently made that the judge should direct a verdict whenever the evidence is such that he would be justified in setting the verdict aside. The distinction, however, is clear. Where there is substantial evidence in support of plaintiff's case, the judge may not direct a verdict against him, even though he may not believe his evidence or may think that the weight of the evidence is on the other side; for, under the constitutional guaranty of trial by jury, it is for the jury to weigh the evidence and pass upon its credibility. He may, however, set aside a verdict supported by substantial evidence where in his opinion it is contrary to the clear weight of the evidence, or is based upon evidence which is false; for, even though the evidence be sufficient to preclude the direction of a verdict, it is still his duty to exercise his power over the proceedings before him to prevent a miscarriage of justice.... A verdict can be directed only where there is no substantial evidence to support recovery by the party against whom it is directed or where the evidence is all against him or so overwhelming so as to leave no room to doubt what the fact is.... Verdict may be set aside and new trial granted, when the verdict is contrary to the clear weight of the evidence, or whenever in the exercise of a sound discretion the trial judge thinks this action necessary to prevent a miscarriage of justice.

*Garrison v. United States*, 62 F.2d 41, 42 (4th Cir. 1932). To emphasize, a new trial may be ordered if the trial court believes that the verdict "is contrary to the clear weight of the evidence," or that a new trial is "necessary to prevent a miscarriage of justice."

■ Campus objects to this court entertaining those issues which were not asserted at trial or within the ten days allowed by Rules 59(b) and 50(b). Although the motions were filed in a timely manner, Celotex has raised additional issues which were not included in the original motion. The objection, as it relates to Rule 50(b) is well taken. Celotex is barred from raising new grounds

not included in its motion for a directed verdict. *Sulmeyer v. Coca Cola Co.*, 515 F.2d 835, 846 (5th Cir. 1975), *cert. denied* 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 341 (1975); *Moran v. Raymond Corp.*, 484 F.2d 1008, 1014 (7th Cir.), *cert. denied* 415 U.S. 932, 94 S.Ct. 1445, 39 L.Ed.2d 490 (1973).

The courts have been more liberal, however, in allowing additional grounds to a motion for a new trial under Rule 59, due to the language of Rule 59(d), which reads:

> The court may grant a motion for a new trial, timely served, for a reason not stated in the motion.

This amendment has been interpreted by the courts to permit the movant to supplement the grounds for his motion for a new trial, so long as the opposing party has an adequate opportunity to respond to movant's contentions. See *Moore's Federal Practice*, § 59.09(2). The Sixth Circuit advanced this very point in *Pogue v. International Industries, Inc.*, 524 F.2d 342, 344 (6th Cir. 1975):

> We conclude that a district court may in its discretion consider the issues raised in the amended motion for a new trial even though it was not filed within the time provided for by the rule, where as here, the original motion for a new trial was filed within the ten (10) day rule time period.

Indicative of the Fourth Circuit's liberality as to the requirements of Rule 59 is the case of *Witt v. Merrill*, 208 F.2d 285 (4th Cir. 1953), which holds that the Federal Rules of Civil Procedure should not be transformed into technical traps for the unwary. *Witt* cited the decision in *Fishbaugh v. Armour & Co.*, 185 F.2d 541, 542 (4th Cir. 1950) where it was stated that, "[t]he rule should be liberally construed and review should not be denied on mere technicalities where this can be avoided." The *Witt* court went on to conclude that,

> To hold that the motion for a new trial was a nullity because the grounds were not stated, even though the trial judge entertained it ... would be to deny review on a technicality in contravention of the spirit of the rules.

Fairness requires that the additional grounds posed by Celotex be considered. The lack of a transcript may delay a party who must take considerable time to review its trial notes to determine more specific grounds for its motions, especially in a long and complex case such as the present litigation. *Alcaro v. Jean Jordeau, Inc.*, 3 F.R.D. 61 (D.N.J.1942), *rev'd on other grounds*, 138 F.2d 767 (3rd Cir. 1943); *Williamson v. Williamson Pulp and Paper Co.*, 8 F.R.D. Serv. 7b 2, Case 1 (M.D.Pa.1944). Further, in a case as significant as this one, this court feels it should take every opportunity to study and pass on the questions raised by the motions. The issues are complex and the trial court should be given the opportunity to clear up the confusion of the issues and to insure that no party becomes the victim of a miscarriage of justice. Finally, since Campus has had sufficient notice and has addressed these issues in its brief, Campus will suffer no prejudice if the court considers these issues.

## STATUTE OF LIMITATIONS

Celotex urges that the action be dismissed or in the alternative that judgment be entered in its favor on the grounds that the statute of limitations, set forth in South Carolina Code § 15–3–530, is a bar to the warranty and negligence claims asserted against it. These claims, Celotex contends, arose more than six years next preceding the dates upon which the complaint was filed in the federal forum.[32]

The facts upon which this defense is based are simple. In 1968, Celotex sold Bond Ply roofing materials to Fort, who erected a roof constructed therefrom for general contractor Kahn upon premises owned by Chester County Development Authority. In installing the roof upon the warehouse in question, Kahn acted as general contractor, and Fort as its subcontractor. The roof began to leak in 1973 and the leaks became progressively more numerous and more serious as time passed. In 1974, Campus bought the warehouse from the Chester Development Authority and, in February of 1976, more than seven years after the roof was installed and three years after the roof first began to leak, Campus filed suit.

At trial, believing that the South Carolina Supreme Court would probably apply the "discovery" rule, this court allowed the negligence count to go to the jury. Celotex now makes a two-pronged attack upon this ruling, alleging first, that this ruling was contrary to the South Carolina cases which hold that the statute of limitations begins to run when the cause of action arises; and second, that by the doctrine of "inclusio unius est exclusio alterius" the legislature has indicated that the "discovery" rule applies only to medical malpractice actions.[33]

As to the negligence cause of action, Celotex notes that § 15–3–530 is the applicable six-year statute of limitations. Since the South Carolina courts have generally construed that the statute begins to run when the cause of action arises, *Brown v. Finger*, 240 S.C. 102, 124 S.E.2d 781 (1962), the crucial question is when does the cause of action arise in cases involving latent

---

32. Illustrative of the excellent advocacy on the part of all counsel in this dispute, is the procedural skirmishing on the statute of limitations issue. Campus contends that Celotex cannot now raise the statute of limitations defense since it should have been urged at the directed verdict stage. The transcript indicates this is not a meritorious objection in that the statute of limitations defense was raised before trial in a motion to dismiss, at the directed verdict stage, Transcript at 1558, and at the close of all the evidence. Therefore, this matter is properly before the court at this time.

33. The motion for judgment n. o. v. raises the statute of limitations as a bar only to the negli-

gence and express warranty causes of action. Celotex does not raise the statute of limitations as a bar to plaintiff's cause of action for fraud and thus waives that ground, apparently recognizing the applicability of § 15–3–530(7), South Carolina Code of Laws, 1976, which provides as follows:

Within six years. (7) Any action for relief on the ground of fraud in cases which prior to the adoption of the Code of Civil Procedure in 1870 were solely cognizable by the Court of Chancery, the cause of action in such case not to be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud; . . . .

defects which cannot reasonably be discovered except with the passage of time. If any cause of action accrued on the date of sale, in 1968, it would be barred since the complaint was not filed until February 17, 1976. However, if any cause of action accrued on the date of the injury or on the date plaintiff discovered the injury, it would not be barred since the roof began to leak in December, 1973.

In 1976, this court concluded that, if faced with the issue of medical malpractice, the South Carolina Supreme Court would apply the discovery rule. *Gattis v. Chavez*, 413 F.Supp. 33 (D.S.C.1976). Subsequently, in 1977, the South Carolina Legislature ventured into the area of the statute of limitations for the first time since 1870. In *Act No. 182*, the legislature provided that an action for damages due to personal injury arising from medical malpractice must be brought within either two or three years from the date of discovery, depending on the type of malpractice involved.[34] However, the legislature did not limit its reforms to medical malpractice. In Section 5 of the same Act, now codified as § 15–3–535, the legislature applied the "discovery" rule to personal injury actions commenced under § 15–3–530(5):

> Except as to actions initiated under § 15–3–545 of the 1976 Code, all actions initiated under Item 5 of § 15–3–530, as amended, shall be commenced within six years after the person knew or by the exercise of reasonable diligence should have known that he had a cause of action.

Looking to § 15–3–530, we find that Item (5) reads:

> An action for criminal conversation or for any other injury to the person or rights of another, not arising on contract, not hereinafter enumerated, ...

Since the "discovery" rule in § 15–3–535 applies only to Item (5), a preliminary issue is whether the present action comes within the scope of that section. Perhaps one might argue that the negligence charged in this case was a failure to warn or a failure to adequately test, and that the interest involved is the right of the plaintiff to know about the product or to be protected from unsafe products. It could also be argued that this constitutes a personal right under the definition of Item (5) of § 15–3–530. However, Item (5) seems to catch only the residue of actions not enumerated elsewhere. Section 15–3–530(3)[35] provides for damages to real property, while § 15–3–530(4)[36] provides for injuries to any goods or chattels including the specific recovery of personal property. The injury in this case was to property, enumerated elsewhere. Therefore the court must conclude that this cause of action is not covered under Item (5). Accordingly, the question arises as to the significance of the legislature's failure to expand the "discovery" rule to Items (3) and (4), and whether the doctrine of "inclusio unius est exclusio alterius" bars the negligence action.

Clearly the South Carolina Supreme Court has been aware of the problems aris-

---

**34.** Section 2 of Act No. 182, 1977, is now codified as § 15–3–545 which reads as follows:

Actions for Medical Malpractice

Any action to recover damages for injury to the person arising out of any medical, surgical or dental treatment, omission or operation by any licensed health care provider as defined in Article 2 of Chapter 59 of Title 38 shall be commenced within three years from the date of the treatment, omission or operation giving rise to the cause of action or three years from date of discovery or when it reasonably ought to have been discovered, not to exceed six years from date of occurrence. When the action is for damages arising out of the placement and inadvertent, accidental or unintentional leaving of a foreign object in the body or person of any one

or the negligent placement of any appliance or apparatus in or upon any such person by any licensed health care provided by reason of any medical, surgical or dental treatment or operation, such action shall be commenced within two years from date of discovery or when it reasonably ought to have been discovered; ....

**35.** § 15–3–530(3) reads:

An action for trespass upon or damage to real property;

**36.** § 15–3–530(4) reads:

An action for taking, detaining or injuring any goods or chattels including an action for the specific recovery of personal property;

ing from latent defects in property cases down through the years. As this court stated in *Gattis v. Chavez*, 413 F.Supp. 33 (D.S.C.1976):

On several previous occasions the Supreme Court has endeavored to soften the harsh impact which the statute of limitations might otherwise have had on a plaintiff's right to proceed. For example, in a case involving riparian water rights, the court utilized a 'continuing nuisance' theory to allow the plaintiff to recover the impairment of his water rights for the six years immediately preceding, notwithstanding the fact that the tort (polluting the water) actually had begun many years earlier. *Conestee Mills v. City of Greenville*, 160 S.C. 10, 158 S.E. 113 (1931). See also *Sutton v. Catawba Power Co.*, 104 S.C. 405, 89 S.E. 353 (1916) where a dam backed up water onto a plantation but the full effect of rendering the land unfit for cultivation was not ascertained until three years later, the six-year limitation was held not to begin to run until the latter time. *King v. United States*, 59 F. 9 (C.C.S.C.1893), *appeal dismissed*, 164 U.S. 703, 17 S.Ct. 1001, 41 L.Ed. 1182. Moreover, where several bales of cotton were held for safe-keeping and destroyed, it was held that the statute of limitations began to run from the time of the loss, or at the latest, from the time the owner had notice of the loss rather than from the time demand for the goods was made. *Cohrs v. Fraser*, 5 S.C. 351 (1873). These cases are by no means identical to the present action, but they do indicate that the Supreme Court has avoided mere mechanical application of the statute of limitations in the past and would probably not be reluctant to do so again.

413 F.Supp. at 40.

Against this seeming willingness on the part of the courts to mitigate the harshness of the statute of limitations in this area must be balanced the traditional doctrine of "inclusio unius est exclusio alterious"—the inclusion of one is the exclusion of another. Since the legislature had not spoken on the issue of the statute of limitations since 1870, this court in *Gattis* refused to apply the doctrine in a mechanical manner. As this court pointed out at that time, there was no indication that the legislature in 1870 could have foreseen or considered the problems of latent injury due to medical malpractice. Pointing to the nationwide trend since 1870, this court then went on to adopt the "discovery" rule. However, this court faces a different situation today than it faced in 1976. Since the legislature considered this problem in 1977 and acted in reference to personal injury actions, the inference raised by the traditional doctrine to the effect that the legislature meant to exclude actions for injury to property, seems more reasonable at this time. Although there is no evidence before this court that the legislature actually did consider property suits, one could assume that the legislature was aware of the problem in this area due to the tremendous amount of "products liability" actions in this country in the last 15 years.

Fortunately this court need not seek to read the South Carolina legislature's intent since the South Carolina Supreme Court has implicitly done so in the recent decision of *Mills v. Killian*, S.C., 254 S.E.2d 556 (1979). *Killian* was an action to foreclose a mortgage with a cross claim for professional negligence by the lending institution against its attorney who failed to discover the existence of the assignment of a real estate mortgage in his title search. The trial court found that plaintiff had a valid second mortgage and ordered that the debt be recovered from the lending institution. However, the cross claim against the attorney was held to be barred by the statute of limitations, even though there was no notice of the defect until the *Killian* action was commenced.

On appeal the Supreme Court reversed the decision on the cross claim, holding that the statute of limitations did not begin to run until discovery by the injured party. Although the ruling is based in part on a carved out exception where professional negligence is involved, the ruling derives its real support from the equitable notion that

a statute of limitations should accrue with the discovery of the injury. Said the court:

> We conclude the accrual upon discovery rule represents the more equitable and rational view. It would be manifestly unfair to hold First Carolina liable on its general warranty deed but not permit it to prevail against Oxner when First Carolina had no knowledge of his negligence until institution of this foreclosure action.

*Id.* at 558.

The ruling in *Killian* clearly extends the "discovery" rule beyond the confines of § 15–3–530(5). While, the cross-claim in *Killian* was probably governed by § 15–3–530(1), the case must be interpreted to mean that the legislature did not intend to limit the discovery rule to personal injury cases under § 15–3–530(5). Thus the equitable factors cited in *Killian*, which freed that case from the doctrine of exclusion by implication, are operable in this case. Since no reason appears why property damage suits should not be treated on a par with other types of injuries, this court holds that the "discovery" rule applies to actions brought under §§ 15–3–530(3) and (4).

On its breach of express warranty cause of action, Campus asserts, the applicable statute is § 36–2–725(2):

> A cause of action accrues for breach of warranty when the breach is or should have been discovered.

Celotex contends that by its title, "Statutes of limitations in contracts of sale," this section applies only to a breach of warranty by the seller to the buyer in a contract of sale. Celotex also refers to the South Carolina Reporters Comments relative to this section for the proposition that in South Carolina the cause of action accrues when the breach occurs, rather than upon discovery.

Celotex's first argument is merely a different approach to the defense of privity which Celotex has raised to the warranty cause of action.[37] The UCC, as adopted by South Carolina, has abolished privity as a requirement to recovery for breach of warranty when the person injured is a natural person. S.C.Code Ann. § 36–2–318;[38] Campus of course is not a natural person. However, Official Comment 3, to § 36–2–318 states:

> This section expressly includes as beneficiaries within its provisions the family, household, and guests of the purchaser. Beyond this, the section is neutral and is not intended to enlarge or restrict the developing case law on whether the seller's warranties, given to his buyer who resells, extend to other persons in the distributive chain.

By the incorporation of this language, the Legislature has given the courts a rule of construction to work with. The most reasonable interpretation to this court of Official Comment 3 is that the Legislature, by remaining neutral on the issues left unconfronted by the statute, and by disavowing any intent to influence the developing case law, has left to the courts the responsibility for determining the scope of the privity defense.[39]

The South Carolina courts have never determined whether a corporation may recover on express warranty absent privity. In fact, only one case has discussed the privity issue as it relates to warranties. In *Odom v. Ford Motor Co.*, 230 S.C. 320, 95 S.E.2d 601 (1956), the Supreme Court discussed the possibility of recovery under express warranty without privity where the

---

**37.** See discussion at 58 infra.

**38.** § 36–2–318 reads:

A seller's warranty whether express or implied extends to any natural person who may be expected to use, consume or be affected by the goods and whose person or property is damaged by breach of the warranty. A seller may not exclude or limit the operation of this section.

**39.** Official Comment 2 to § 36–2–313 which reads as follows:

"Although this section is limited in its scope and direct purpose to warranties made by the seller to the buyer as part of a contract for sale the warranty sections of this article are not designed in any way to disturb those lines of case law growth which have recognized that warranty need not be confined either to sales contracts or to the direct parties to such a contract."

purchaser had relied upon representations made by the manufacturer in its brochure. Although the issue of express warranty was not before the court at that time, *Odom* seemed to imply that this state would go along with the majority line of reasoning. While holding that privity was necessary in implied warranty cases, the court distinguished the express warranty situation, implicitly raising the possibility that privity would not be necessary under an express warranty.

The traditional approach holds that express warranty is a contract action, and that to recover on contract one must either be in privity or be the one for whose benefit the contract was made. See *Lewis v. Terry*, 111 Cal. 39, 43 P. 398 (1896); *Collum v. Pope & Talbot, Inc.*, 135 Cal.App.2d 653, 288 P.2d 75 (1955); *Altorfer Bros. Co. v. Green*, 236 Ala. 427, 183 So. 415 (1938); *Holland v. Good Bros., Inc.*, 318 Mass. 300, 61 N.E.2d 544 (1944); See also Anno., 75 A.L.R.2d 39. This prevalent but mistaken notion was challenged in *Rogers v. Toni Home Permanent Co.*, 167 Ohio St. 244, 147 N.E.2d 612 (1958) which noted that the original basis for warranty recovery was an action for deceit or for a breach of duty assumed by the seller. Other writers and cases have since registered their agreement with this position. See citations in Frumer & Friedman, *Products Liability*, § 16.03[1], [3A–52].

But the courts have not been tied down to reaching an unjust result because of a legal technicality. The first case to allow recovery absent privity was *Baxter v. Ford Motor Co.*, 168 Wash. 456, 12 P.2d 409 (1932), 15 P.2d 1118 (1932), which was an action to recover for a lost eye which resulted when a pebble shattered a windshield which had been represented as nonshatterable. *Frumer & Friedman* quote the court:

> Since the rule of caveat emptor was first formulated, vast changes have taken place in the economic structures of the English speaking peoples. Methods of doing business have undergone a great transition. Radio, billboards, and the products of the printing press have become the means of creating a large part

of the demand that causes goods to depart from factories to the ultimate consumer. It would be unjust to recognize a rule that would permit manufacturers of goods to create a demand for their products, by representing that they possess qualities which they, in fact, do not possess, and then, because there is no privity of contract existing between the consumer and manufacturer, deny the consumer the right to recover damages resulting from the absence of those qualities, when such absence is not readily noticeable.

Similar reasoning was employed in *Bahlman v. Hudson Motor Car Co.*, 290 Mich. 683, 288 N.W. 309 (1939), where the court held liability can be imposed "on the maker of false statements and may be enforced by the ultimate consumer of the product to whom the statements are directed." *Id.* at 313. See also *Rogers v. Toni Home Permanent Co.*, supra.

In considering the *Odom* holding on implied warranty, as a clue to South Carolina's view on privity, one must recognize that an express warranty stems from a different footing than implied warranty. In an implied warranty there is no express representation as to the quality of a product, but the warranty is implied as a matter of law. *Odom* noted that expanded liability to third persons had been limited to recovery resting upon negligence, but that when proceeding on the contractual of implied warranty, the injured party must be able to establish privity with the manufacturer. On the other hand, express warranty arises from the representations which the manufacturer uses to induce purchase of his products, although not directly from the manufacturer.

■ This court reads the *Odom* case as intimating that privity will be abolished as a requirement in express warranty. When one considers the liberality of the South Carolina Supreme Court in products liability matters, the opinion in *Odom*, and the greater weight of authority in this country, the factors are sufficient to convince this court that a plaintiff who relies on express representations by a manufacturer will be allowed to recover absent privity.

That plaintiff is a corporation should not change this result. Just as it is unfair to allow a manufacturer of a defective product to escape from liability via privity when the plaintiff is an individual, so it is unfair to disallow recovery when a corporation brings suit. Nor is the greater sophistication of a corporation a guarantee against a corporation being misled by the manufacturer's claims. The instant case is a perfect example. The two Campus employees who chose Bond Ply were much more knowledgeable about roofing than the average person, yet they too were unaware of the defects in Bond Ply. Why should they not be protected? Finally, is there any reason why an innocent corporate consumer should have to bear the loss when a manufacturer puts a defective article into commerce from which it hopes to profit? The same risk allocation policy should apply to corporate transactions as to consumer purchases. Why should an innocent party suffer rather than the one who introduced the product in commerce for profit? There is no reason, and in the opinion of this court, lack of privity cannot be asserted as a defense in an express warranty action against a corporation in South Carolina.

Celotex further contends that the South Carolina Reporter's Comments state that a cause of action for breach of warranty accrues at the time of the breach. This court is satisfied that the Reporter's Comments, which directly contradict the text of § 36–2–725, were written before the legislature passed this state's version of U.C.C. § 2–725. See 23 S.C.L.Rev. 308, 310, n. 15 (1971). The original U.C.C. § 2–725, in pertinent part, read, "a cause of action accrues when the breach occurs regardless of the aggrieved parties' lack of knowledge of the breach." The Comments are of no assistance in interpreting South Carolina's version which reads as set out earlier in this opinion. Clearly the Comments refer to the original U.C.C. version of the U.C.C. and not to South Carolina's version.

## REAL PARTY IN INTEREST

Every suit in federal court must be prosecuted in the name of the real party in interest.[40]

■ The purpose of the rule mandating that the owner of the substantive right be the prosecutor of the suit is to protect defendants from the harassment of suits by persons who do not have the power to make final and binding decisions concerning prosecution, compromise and settlement. *Virginia Elec. & Power Co. v. Westinghouse Elec. Corp.*, 485 F.2d 78 (4th Cir. 1973), *cert. denied* 415 U.S. 935, 94 S.Ct. 1450, 39 L.Ed.2d 493, *Rackley v. Board of Trustees of Orangeburg Regional Hospital*, 35 F.R.D. 516 (D.S.C.1964).

■ In a diversity action such as this, the governing substantive law is the law of South Carolina. The issues of whether a cause of action exists, whether causes of action are assignable, and whether they have been successfully assigned, are matters of substance which require this court to canvass the law of South Carolina for guidance. *Dixie Portland Flour Mills, Inc. v. Dixie Feed & Seed Co.*, 382 F.2d 830 (6th Cir. 1967); *Dubuque Stone Prods. Co. v. Fred L. Gray Co.*, 356 F.2d 718 (8th Cir. 1966).

The facts pertaining to this issue are undisputed. In 1964, Chester Development Association ("Chester Development") leased a warehouse located on a site near Chester, South Carolina, to Campus. The lease provided that Campus should have the option to require the landlord to construct at landlord's cost, additions to the building provided the aggregate area of such additions not exceed 500,000 square feet. In connection

**40.** Rule 17(a), Federal Rules of Civil Procedure, provides:

Every action shall be prosecuted in the name of the real party in interest.... No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been al-lowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest; and such ratification, joinder, or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest.

with such additions, the lease directed that the "tenant shall have the absolute right in its discretion to select the contractor .... and to negotiate such contract ..." Campus exercised this option first in 1966, then again in 1968. The lease also included an option to purchase the building for the amount of the unpaid aggregate rentals payable under the lease, including those payable with respect to any additions to said building, less any savings incurred as a result of the prepayment of the loan out of the purchase price.[41] The contract for the second addition was let to Kahn who, in turn, subcontracted with Fort for the installation of the roof. The roof, which is the subject matter of the present litigation, was installed during the summer of 1968.

Five years later, Campus gave the landlord, Chester Development, written notice of its intention to exercise the Tenant's Purchase Option contained in Paragraph 19 of the 1964 Lease. Title was transferred by deed dated February 4, 1974. The deed, employing traditional language, included in the conveyance the described property "together with all and singular the Rights, Members, Hereditaments, Improvements and Appurtenances to the said Premises belonging, or in any wise incident or appertaining." This transfer took place after the leaks had begun.

In 1976, approximately eight years following the initial erection of the roof, suit was filed in the name of Campus. Celotex then filed a motion to dismiss predicated upon the argument that Campus was not the real party in interest at the time when suit was filed. No effort was made to substitute Chester Development for Campus as the party plaintiff in the case, nor to add Chester Development as an additional party plaintiff; rather Campus obtained an assignment[42] of any cause of action which Chester Development might have had, and continued to pursue the claims as plaintiff.

The parties have extensively briefed the issue of whether Campus acquired the cause of action in the 1974 deed from Chester Development. Celotex argues that a cause of action does not accompany a conveyance of real estate unless expressly included. The case of *Hi Hat Elkhorn Coal Co. v. Kelly*, 205 F.Supp. 764 (E.D.Ky.1962) is cited by Celotex for the rationale that Campus is presumed to have obtained the benefit of reduced value by the amount the prior owner could have recovered, since Campus acquired the building with knowledge of the existence of a leaking roof. Campus responded that it received no diminution of purchase price due to the leaks, hence the rule of *Hi Hat Elkhorn* is inapplicable to this deed. *Cook v. Commercial Casualty Ins. Co.*, 160 F.2d 490 (4th Cir. 1947); *Wise v. Picow*, 232 S.C. 237, 101 S.E.2d 651 (1958). Alternatively, if one accepts the need for an express transfer of the cause of action, Campus asserts that the word "hereditament" in the deed is sufficiently broad in meaning to transfer the cause of action to Campus.

Intriguing as these arguments are, they need not be resolved in this case: the subsequent assignment in 1977 is sufficient to make Campus the real party in interest for Rule 17(a) purposes.[43]

■ Celotex cites two South Carolina cases to support its argument that the 1977

---

**41.** The exact language of the lease reads as follows:

> The purchase price shall be a sum equal to the unpaid balance of the aggregate rentals payable under this Lease, including the aggregate Additional Rental, if any, payable with respect to any addition to said building which may have been constructed by Landlord, less the savings in interest on any loans then outstanding and incurred by Landlord in connection with financing the building on the Demised Premises and any additions thereto, which savings result from the prepayment of such loans out of the purchase price.

**42.** In pertinent part, the instrument dated January 20, 1977, assigns:

> "[A]ll claims and/or causes of action which the said Chester Development Association may have had."

**43.** Also rendered moot by the subsequent assignment are the claims of Campus that its interests in the building are important enough to entitle it to bring this suit, regardless of the 1974 deed or the 1977 assignment.

assignment is invalid as a transfer of causes of action for a suit where the suit is already filed by the assignee at the time of the transfer. However, Celotex's argument does not attack the validity of the assignment so much as its timeliness. Despite the fact that timeliness is a question of federal law governed by Rule 17(a), and not by South Carolina law,[44] Celotex's authority is inapposite.

Celotex relies on *The Bank of the State of S. C. v. The S. C. Mfg. Co.*, 34 S.C.L. (3 Strob.) 190 (1848) and *Young Receiver v. Peoples Bank, et al.*, 163 S.C. 57, 161 S.E. 324 (1931), for the position that one who brings a suit prior to the time he has the right to bring it, will have judgment rendered against him, even though he subsequently acquires the right to bring the suit. *Young* and *The Bank of S. C.* dealt with suits filed before a cause of action was mature, and did not deal with the issue of whether a party can obtain real party in interest status by subsequent assignment of a cause of action which had *accrued before suit was commenced*. *The Bank of S. C.* case was an action for a writ of trespass commenced before plaintiffs had received title to the land by the Sheriff. The court held that plaintiffs could not:

> [D]emand the possession of the land until they were invested with the legal estate, which can be done only by a conveyance in writing, signed, sealed and delivered by the owner, or someone authorized by law to convey.

34 S.C.L. (3 Strob.) at 193.

Thus the case turned on the fact that plaintiffs' cause of action had not yet matured.

In *Young*, suit was brought against the directors of a bank on their liability as endorsers of a note on which the bank was the principal obligee. By contract, an express condition precedent to the directors' liability was that the holders of the note must first exhaust the bank's assets. Although the bank's resources were depleted subsequent to the filing of the suit, the court dismissed the suit because the cause of action had not matured at the time of

filing. In its reasoning the court stated that the rule served to prevent premature suits which could result in confusion, uncertainties, and complications in business, and in harassment of defendants. The court dismissed the suit without prejudice to plaintiff's refiling.

Here, the cause of action was mature at the time Campus filed its complaint. Furthermore, neither *Young* nor *The Bank of S. C.* speak to the validity of an assignment after suit is commenced.

■ There being no real dispute that the cause of action could be assigned in 1977, or that the instrument in question effected a valid assignment, the issue is whether one can acquire real party in interest status after suit is instituted. This raises a question of whether this court should look to federal or state law in deciding the issue of timeliness.

The keystone case of *Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965), transformed the traditional analysis of choice of law in the federal courts which had developed after the seminal case of *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Discarding the "outcome determinative" test of *Guaranty Trust Co. v. York*, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945), as modified by *Byrd v. Blue Ridge Electric Cooperative, Inc.*, 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958), *Hanna* held that any federal rule which can reasonably be characterized as procedural should apply so long as it meets constitutional muster and comes within the terms of the enabling act under which the rules were promulgated.

The constitutionality of Rule 17 has apparently been accepted and is not questioned here. Since Rule 17 clearly relates to the procedural issue of who should be allowed to prosecute a suit in federal court (once a cause of action is presumed to exist), the only inquiry for this court is whether the question of "timeliness" is within the scope of Rule 17(a). If so, federal law must

---

**44.** See discussion at 84 *infra*.

govern whether Campus can pursue its claim.

Rule 17(a) in part provides that no action shall be dismissed on the ground that it is not prosecuted by the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of the real party in interest. The rule further provides that such ratification, joinder or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest. Some courts have interpreted the word "ratification" to validate an arrangement by which the real party in interest authorizes the continuation of an action brought by another and agrees to be bound by its result, thereby eliminating any risk of multiple liability. See Wright & Miller, *Federal Practice and Procedure*, § 1555 at 709 (West Pub. Co. 1978). Here, Chester Development went so far as to explicitly assign its cause of action, thereby eliminating itself as a real party in interest.

Although Rule 17(a) does not explicitly address the issue of the timeliness of an assignment, courts in construing the rule have held that even when the claim is not assigned until after the action has been instituted the assignee is the real party in interest and can maintain the action.

The first case to deal with this issue was *Kilbourn v. Western Surety Co.*, 187 F.2d 567 (10th Cir. 1951). Kilbourn, possessing an oral assignment of a claim, had collected $1,625.00 in cash and taken some forged checks in payment of the balance. He then filed suit to collect the balance represented by the forged checks. The trial court apparently dismissed the action on the basis that the assignee was not the real party in interest. The Tenth Circuit held that Kilbourn became the real party in interest in a written assignment of the claim to him after suit had been commenced. The court made the telling observation that the then-new rules of federal procedure were adopted to free the courts from the straitjacket of technical rules of pleading and procedure. The purpose of Rule 17(a), according

to the court, was to facilitate a just and speedy adjudication between the interested parties without regard to the technicalities of the rules. The court noted that an adjudication by the present parties would be final, and that there was no danger of harassment by numerous actions by different claimants. Citing the liberal spirit of the new rules which allow substitution of parties to bring in the real party in interest even though an action has already been commenced, the court concluded that justice and the spirit of the new rules required that Kilbourn be allowed to bring the suit even though the assignment postdated the commencement of the action.

Fifteen years later, the Eighth Circuit considered the same issue in *Dubuque Stone Prods. Co. v. Fred L. Gray Co.*, 356 F.2d 718 (8th Cir. 1966). The Eighth Circuit also refused to accept the argument that the assignment was invalid because it was made after the suit had been filed. Stressing that the assignment had occurred before trial and that defendant had suffered no prejudice therefrom, the court saw no reason to prevent the assignee from prosecuting the suit. By assigning its cause of action to Gray, the assignor lost any right to bring a later suit and the assignment did not affect any defenses which Dubuque might be able to assert against the first plaintiff. The court remanded the case for prosecution under Rule 17(a). See also *Petrikin v. Chicago R. I. & P. R. Co.*, 15 F.R.D. 346 (W.D.Mo.1954).

To dismiss this judgment against Celotex on grounds that Campus was not the real party in interest would require such a technical approach to the problem that all common sense and justice would be left strewn in its path. First, from 1964 on, all actions concerning the construction and additions to this building had taken place at the direction and instigation of Campus. The Chester Development Authority has been a mere "straw man" throughout, while Campus has been the party directly benefited by the construction of the building. Second, this assignment took place a year before the trial, leaving Celotex with ample time to

prepare a defense. Furthermore, Celotex was in no way prejudiced by the assignment since all defenses which were available to it against Chester Development were also available to it against Campus. Finally, Chester Development is effectively precluded from bringing any suit on the roof in question, thus insuring that the policies of Rule 17(a) have been protected in this case. For these reasons, Celotex's motions for a new trial and for judgment n. o. v. on the grounds that Campus is not the real party in interest, are denied.

## NEGLIGENCE AND GROSS NEGLIGENCE

Celotex makes several contentions which pertain to its view of the sufficiency of the evidence to support the jury's verdict on the issues of negligence and gross negligence. It is asserted that the roof was not applied according to the 220–INS specifications; [45] that nothing "bridges the gap" between possible inadequate testing in 1964 and the application of the roof in 1968; that the pre-marketing testing met the terms of the only standard which could reasonably be called an industry standard; that the prob-

lem with Bond Ply was an inadequacy in tensile strength which played no role in the failure of this roof; and that the proximate causes of the roof's failure were loose insulation and bonding, which were not attributable to Celotex.

It is true that the specifications were not followed precisely in constructing this roof. The 220-INS specification was a series of instructions for installing a two-ply Bond Ply roof on all types of decks with preformed roof insulation and a maximum incline of three inches per foot. It was proven at trial that the roof in question was applied by a method known as "phasing" or "one on one",[46] rather than by the written specified method of application known as "shingling". In the "shingling" method both plies, one overlapping the other, would be applied in one operation, whereas in a "phasing" method of application, one ply would be applied throughout the area being roofed before the second ply was applied on top. The major advantage of shingling is that there is less danger of rainfall permeating the lower ply before the roofer has time to complete the entire roofing process.[47] However, the phasing method, if ap-

---

**45.** Plaintiff's Exhibit # 82 is the Allied Chemical (Barrett Division) "Built-up Roofing System Manual" (1967) and on page 14 the specifications are as follows:

BARRETT BOND PLY ROOF
—Series 200

1. For details covering application of roof insulation and vapor barriers, see Roof Insulation Specification, pages 8 and 9.
2. Starting at low point of roof, mop surface of insulation with approx. 20 lbs. per 100 sq. ft. of Barrett BOND PLY Cement into which, while hot, embed one BOND PLY coated roofing sheet 18 in. wide with ends lapped 6 in. and cemented for full length. On inclines 1 in. per foot or greater, nail all edges 12 in. o. c.
3. Lay one full width BOND PLY coated roofing sheet cemented to underlying coated sheet and to the roof insulation with approx. 20 lbs. per 100 sq. ft. of Barrett BOND PLY Cement. Broom each ply to assure complete embedment. Lap ends 6 in. and cement for full length of lap.
4. Continue laying full width BOND PLY coated roofing sheets lapped 19 in. horizontally and cemented for full width with approx. 20 lbs. per 100 sq. ft. of BOND PLY Cement. Broom each ply to assure complete embed-

ment. Extend all plies up face of cant and cut off evenly at wall line. If cant strip is not provided turn up all plies 1 in. at walls and curbs.
5. On inclines of 1 in. per foot or greater, nail each sheet 2 in. and 11 in. from top edge, spacing nails 12 in. o. c. staggered.
6. Over entire surface pour a uniform top coating into which, while hot, embed specified quantity of surfacing material.

**46.** Testimony of Mr. Stafford, plaintiff's expert, Transcript at 1245.

**47.** A major disadvantage of the shingling method of applying a two-ply roof is that the margin for roofer error is less. This diminished margin assumes greater significance when only two plys are present since the gravity of any error is greater. Testimony of Stafford, Transcript at 1124–27. (Although Mr. Stafford referred to a greater margin for error, the explanation by him of that comment indicates that he meant either a "greater chance of error" or a "small margin of error." In any event, his explanation indicates that the chances for roofer error are greater with the shingling application of a two-ply roof.

plied the same day, also prevents the danger of water permeating the lower ply, prevents fishmouths which had been a serious problem with the application of the new bond-ply system[48], and had a greater margin of error in application for the roofer.[49] Although there is testimony that rainfall may have reached the lower ply on at least one occasion, and that the roof may have been left unprotected overnight on at least one other occasion, there was evidence to show that the failure to follow the specification was immaterial insofar as the failure of the roof was concerned.[50] There was also evidence that Celotex waived the assertion of this specification as a defense in that Celotex itself, permitted the application of the Bond Ply system in a manner contrary to its written specification.[51] Mr. Dugger and Mr. Rissmiller both testified that Celotex in fact anticipated the application of Bond Ply in a manner contrary to the literal requirements of the specifications.[52] Further, Mr. McClellan recommended that Fort use the phasing method because of Fort's past problems.[53] Thus the jury would not be in error to conclude that Celotex reasonably anticipated that the product would be applied by such a method. This court finds no reason to disturb the jury's verdict on this issue.

The argument that there is no connection between the 1964 and 1968 specifications, and that, therefore, any inadequate pre-marketing testing relating to the 1964 specification is irrelevant to the 1968 specification, ignores the thrust of plaintiff's negligence theory. Campus' theory was that there was inadequate testing both before and after marketing. There is ample evidence to justify the jury's verdict in favor of the Campus theory. The only evidence of any testing, other than that which was done "on an owner's roof,"[54] was the three applications of Bond Ply in 1963–64. It is uncontradicted that these applications were only for the purpose of determining the ease of application of Bond Ply, not its ability to adequately perform its function in a built-up roof. In answers to plaintiff's first set of interrogatories, introduced into evidence during Campus' case, Celotex either denied knowledge of the existence of any tests concerning Bond Ply or said that they were "not a matter of record" with Celotex.[55] Celotex never put up any evidence to show the existence of other testing prior to 1968. There was, therefore, ample evidence from which the jury could conclude that Celotex was not only negligent but grossly negligent, in adequately testing its product both before marketing it and up to the time of sale in 1968, especially in view of its being sold as a 20-year product.

Celotex disputes the definition of what constitutes "adequate testing". Celotex asserts that its Exhibit PPP, a draft of a study of roofing systems and constituent materials and components, sets the "standards" which were complied with by Bond Ply. This exhibit was never admitted into evidence, thus the document cannot be considered by this court.[56] Insofar as Celotex seeks to compare its testing to that recommended in this document, there can be no comparison since the report does not exist in this court's eyes.

As for those portions contained in the record, the jury was justified in taking a skeptical view that the industry standard

48. Transcript 1648, Watts.

49. Transcript 1265, Stafford.

50. *Id.*, Transcript at 1246.

51. Testimony of Rissmiller, Transcript at 920–922.

52. Testimony of Dugger, Transcript at 2119, 2120, 2159; Testimony of Rissmiller, Transcript at 920 and 922.

53. Testimony of Fort, Transcript at 1704.

54. Testimony of Rissmiller, Transcript at 654, 668 and 724.

55. Published Interrogatories, Transcript at 1443–1445.

56. In fact, counsel for Celotex disavowed any intention of introducing it. Transcript at 1358. It was only after plaintiff's counsel requested that it be marked for identification that it was marked as Celotex PPP for identification.

for testing is one year. Mr. Stafford pointed out that one year was an arbitrary time period, subject to much further discussion. Further, the "standards" referred to by Celotex were applicable only to residential roofing.[57] In light of other evidence which was presented to the jury on the issue of inadequate testing, including many documents from Celotex itself, it was reasonable for the jury to believe that Celotex inadequately tested its product.

Celotex makes a determined attack on the jury's finding of proximate cause. First, Celotex contends that the main problem with Bond Ply was its tensile strength inadequacies and that tensile weakness played no part in the failure of this roof. Apparently the jury chose to believe the testimony of Mr. Stafford who testified that the failure of the Campus roof was due to the failure of the coated felts of Bond Ply incorporated into the roof to function properly which in turn was due to certain properties inherent in coated felts which make them unsuitable for use as the principal components of a waterproofing membrane.[58] Citing many problems with Bond Ply in addition to tensile strength, Stafford concluded that a membrane composed of coated felts was unsuitable since such a membrane would have a relatively low level of tensile strength,[59] a lower level of tolerance to flexing than a membrane consisting of four plies of uncoated felts,[60] and a greater susceptibility to moisture penetration due to the lesser quantities of asphalt present in the felts.[61] When this testimony was coupled with the evidence that the presence of conditions on the Campus roof was directly attributable to one or more of the above deficiencies, the jury clearly had sufficient evidence to conclude that Celotex's product caused the failure of the Campus roof.

The second attack on proximate cause is found in Celotex's allegation that ridging attributable to loose insulation and ponding caused the failure. Although there was evidence to that effect, the jury also had before it the testimony of Mr. Stafford who testified that ridging could very easily have been attributable to a source other than loose insulation since the insulation was not loose at the sites of the ridges found by Mr. Stafford.[62] According to Mr. Stafford, ridging is also caused by moisture permeation.[63] Stafford also testified that two plies of Bond Ply permit water to permeate faster than do four plies of ordinary felts;[64] that splitting occurs in three- and four-ply roofs but is more prevalent in two-ply roofs because they are weaker;[65] and that he had run into these problems with Bond Ply as early as 1967 and his views would have been substantially the same then as now.[66]

Although Stafford testified that some of the blistering was probably due to rain having fallen on the unprotected bottom ply when it was installed, it was not his opinion that this was the cause of the roof failure. Rather he felt that the Bond Ply system was insufficient for protection from water permeation. Stafford testified that the Bond Ply permitted faster water permeation because of the nature of the coated felt as opposed to the uncoated felt. After installation and mopping, the uncoated felt contains a greater amount of asphalt than a coated sheet whose coating prevents the absorption of asphalt during its application on the roof. Since asphalt is the waterproofing agent, an uncoated felt in a roof

57. Industry standards, written by those who stand to gain from shorter periods of testing, may be naturally suspect in a jury's eyes.

58. Testimony of Stafford, Transcript at 1186–87.

59. Id., Transcript at 1214.

60. Id., Transcript at 1295.

61. Id., Transcript at 1186–1187.

62. Id., Transcript at 1147, 1172, and 1182.

63. Testimony of Stafford, Transcript at 1164, 1165.

64. Id., Transcript at 1186.

65. Id., Transcript at 1294.

66. Id., Transcript at 1280.

has greater moisture resistance than a coated felt in a roof.[67]

It is not the duty of this court to usurp the function of the jury. Celotex has written a lengthy brief, arguing in effect, the weight of the evidence. Whether or not these arguments have merit is for the jury to decide, not the court. There was certainly substantial evidence of negligence presented to the jury, therefore the motion for judgment n. o. v. is denied. Nor is the weight of the evidence such that this court feels that a miscarriage of justice took place. Therefore, the motion for a new trial is denied.

### DOCUMENTARY EVIDENCE

Celotex objects to the admission of certain documents which, it claims, prejudiced the jury to the extent that a new trial should be granted. Since the documents can be treated most easily by categories, this court will deal with them in three groupings: Bond Ply ads, Bond Ply complaints, and corporate test reports and inter-office memoranda.

### Bond Ply Ads

 Defendant's objection to the use of three advertising items is without merit. Contrary to Celotex's recollection, the documents were neither introduced nor relied upon by Campus, but were admitted without objection as part of Fort's cross-claim against Celotex. The brochure referred to as "One Plus One Equals Four" was proven to have been given to Fort and relied upon by them, and was properly admitted to prove Fort's cross-claim.[68] The record al-

bum distributed by Celotex, entitled "Smash Hits," publicized some of the benefits of using Bond Ply roofing. Celotex does not object to its introduction by Fort, therefore this issue need not be explored.[69] Finally, the trade journal advertisements (Fort's Exhibits GGG through LLL) objected to by Celotex in its motion for a new trial were not admitted.[70]

### Bond Ply Complaints

 Celotex objected to the introduction of evidence concerning complaints by persons who encountered problems with the use of Bond Ply on roofs located throughout the country.[71] The attack on the admissibility of these documents is three-fold. First, Celotex argues Campus and Fort failed to connect the subject matter of these complaints to the Campus roof, since they failed to show "substantial similarity" between this roof and the previous roofs. Second, Celotex submits that evidence to the effect that the Campus roof was in a "substantially similar" condition to that of the roofs mentioned in the complaints, is lacking. Third, Celotex says the documents should have been excluded, under Rule 403, Federal Rules of Evidence, because of the great danger of prejudice and confusion arising from them.

Initially, it must be stated that the evidence of prior complaints was not introduced to show that the Bond Ply on Campus' roof was defective nor was it used to indicate that the causes of problems on previous roofs were related to the causes of the problems on this roof (other than on the issue of notice), as Celotex's arguments seem to assume. At the point when plain-

67. *Id.*, Transcript at 1186–87.

68. Testimony of Richard O. Watts, estimator for Fort, Transcript at 1642. In addition, when Mr. Dugger was testifying for Celotex, Transcript at 1092–2160, his company's own counsel opened the door as to advertising in the "On Top Publication," an "official publication" of Barrett and Celotex, Transcript at 2166–2167.

69. There was evidence in the record that Fort Roofing and Sheet Metal Works had received a copy of this album. Testimony of Watts, Transcript at 1642–1643.

70. The records of the Clerk of Court indicate these exhibits were not offered.

71. Defendant's assertion that Campus introduced evidence of other lawsuits is in error; the only mention of other suits came from one of Fort's witnesses. This improper evidence was immediately excluded by the court, and the injury to Celotex was cured, as discussed *infra* at 102. See Transcript at 1712, 1717 *et seq.*

tiff introduced these documents subsequent to Mr. Rissmiller's identification of them, the record reflects that the purpose of their introduction was to prove Celotex's knowledge of defects which gave rise to a duty to warn.[72] On plaintiff's express warranty and fraud causes of action, the evidence of prior complaints was also relevant to Celotex's state of mind insofar as the representation is concerned and Celotex's knowledge of its truth or falsity or its reckless disregard of its truth or falsity.

Thus the question really boils down to the admissibility of these documents to prove "knowledge" and "intent" on the part of Celotex. There is a distinction between these two terms, and the difference affects the requirements for admissibility.

Rule 404(b), Federal Rules of Evidence, which governs the admissibility of evidence on these issues, reads:

> (b) Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The courts have refined certain common law rules, which Rule 404 may be read to incorporate, governing admissibility of evidence to prove intent and knowledge. It is the common law rules which have drawn the distinctions between "intent" and "knowledge". While "knowledge signifies a being aware," intent frequently signifies "merely the absence of accident, inadvertence or casualty." *Wigmore on Evidence*, § 300 at 192 (3rd ed. 1940). In using prior acts to prove knowledge, Wigmore states "the process of thought is: The other act will probably have resulted in some sort of

warning or knowledge; this warning or knowledge must probably have led to the knowledge in question." Id. § 301 at 194. See *United States v. Brand*, 79 F.2d 605 (2d Cir. 1935). Intent, on the other hand, involves the doctrine of chances—"the instinctive recognition of that logical process which eliminates the element of innocent intent by multiplying instances of the same result until it is perceived that this element cannot explain them all." Wigmore, § 302 at 196. See *Penn Mutual Life Ins. Co. v. M. L. B. & T. Co.*, 72 F. 413 (6th Cir. 1896); *State v. Lapage*, 57 N.H. 245, 294 (1876).

The Fourth Circuit has permitted the introduction of evidence of prior complaints and tests for the purpose of showing knowledge and inadequate testing. In an action for negligence and breach of implied warranty, the court in *Gardner v. Q.H.S., Inc.*, 448 F.2d 238 (4th Cir. 1971), stated:

> Where the issue is one of foreseeability, evidence of what has actually been experienced in the same or comparable situations constitutes proof of the greatest probative value. The only other way foreseeability can be proved is by expert testimony and in most instances it, too, will depend upon actual experience developed by laboratory or everyday experience. In our view, depositions of other users of the product who had experiences similar or identical to that of Miss Runge were clearly admissible to show defendants' knowledge of the harm their product could inflict, provided only that those experiences were brought to the attention of the defendants, or either of them, prior to the incident involved here. *Spruill v. Boyle-Midway, Inc.*, 308 F.2d [79] at 88–89 [4 Cir.]. See, 1 Frumer & Friedman, *Products Liability*, § 1201[2], and cases cited therein.
>
> . . . .

**72.** It was upon this issue that the court directed the jury to consider the evidence of prior complaints. In the jury charge this court stated:

*In determining whether one has knowledge of defects or should have knowledge of defects, if any, in his product, you may consider prior complaints describing substantially similar experiences. Not as to others, but*

substantially similar experiences, provided those experiences were brought to the attention of the manufacturer prior to placing the product on the market, particularly the product for which defects are claimed in this case and not any other case.

Transcript at 2450.

We think also that the testimony of the professor of chemistry who conducted flammability tests should have been admitted, even where those tests were not confined to precisely the same conditions under which the rollers sought to be used by Miss Runge caught fire. See, 1 Frumer & Friedman, *Products Liability*, § 12.-02[2], and cases cited therein. Defendant, and especially Q.H.S., were chargeable with knowledge that the rollers could and probably would be used under a variety of conditions, and the district judge should have been liberal in admitting testimony of this nature for its probative value on the issue of whether Q.H.S. conducted proper tests and whether Q.H.S. had knowledge that its warning was deficient.

*Id.* at 244.

Clearly the complaints presented here are admissible if not too dissimilar in nature from the Campus problems nor too prejudicial. See also *Julander v. Ford Motor Co.*, 488 F.2d 839 (10th Cir. 1973); *Kieffer v. Blue Seal Chemical Co.*, 196 F.2d 614 (3rd Cir. 1952); *New York Life Ins. Co. v. Seighman*, 140 F.2d 930 (6th Cir. 1944).

The guidelines required for admission to show knowledge have not been precisely defined. Some courts have spoken in terms of "sufficient similarity," *United States v. Beaver*, 524 F.2d 963 (5th Cir. 1975), *cert. denied* 425 U.S. 905, 96 S.Ct. 1498, 47 L.Ed.2d 756; *Shively v. United States*, 210 F.2d 131 (4th Cir. 1954). Basically, as stated earlier, the evidence must be judged by the power of prior complaints to give notice of problems relating to the defective condi-

tion, 2 Weinstein & Berger, *Weinstein's Evidence*, § 404[11] at 404–76 (1977); McCormick, *Evidence*, § 200 at 475 (2d Ed. 1972), and is a matter resting largely in the trial court's discretion. *United States v. Feldman*, 136 F.2d 394, 399 (2d Cir. 1943). Realizing that hundreds of potentially different factors are present in every situation, courts have also held that perfect similarity is not required, but that dissimilarities brought out on cross examination go to the weight of the evidence, not its admissibility. *Remseyer v. General Motors Corp.*, 417 F.2d 859 (8th Cir. 1969); *Jones & Laughlin Steel Corp. v. Matherne*, 348 F.2d 394, 400 (5th Cir. 1965); *Lever Bros. Co. v. Atlas Assurance Co., Ltd.*, 131 F.2d 770 (7th Cir. 1942).

One indication of the warning of possible defects which these complaints carried, is the testimony that all of the problems mentioned in the complaints admitted into evidence were present on the Campus roof. Problems with tensile strength and tensile splits,[73] with wet rolls,[74] with excess blocking agents which prevented adhesion,[75] and with moleruns[76] were all proved to be present, either by direct evidence or through inference.

An additional factor favoring their admissibility is that all of the complaints concerned Bond Ply roofs. Although Celotex made much of the fact at trial that the roofs were dissimilar in type of decks, climate, geography, and mode of application, it is interesting to note that while Celotex's correspondence discussed these factors, in the final analysis Celotex perceived the problems to be related to Bond Ply roofs in general. The problem referred to in the

**73.** Campus' expert, Mr. Stafford, testified to the presence of a wall-to-wall tensile split. Transcript at 1138 and 1141.

**74.** Campus introduced evidence that blisters on the roof were due to wetness from two possible causes, one of them being wet rolls. Transcript at 1206, 1160 and 1256. Later evidence that wet rolls were not a problem would constitute hindsight on already admitted evidence. Transcript at 1207, 1210 and 1159.

**75.** Celotex's witness, Mr. Dugger, admitted that adhesion problems could be due to faulty material (excess blocking agent) or poor mopping

(whereby the plies are not adequately pressed into the asphalt during application. Transcript at 2162, 1920 and 1940. Fort's testimony, if believed, would eliminate the second possibility.

**76.** Mr. Heppert, an experienced roofer, testified to the existence of one, while Mr. Haynes pointed out several. Celotex's claim that these people were confusing moleruns with blisters and ridges is not supported by the testimony of its own witnesses who equated moleruns with blisters or ridges.

Bi-monthly Report for August 15—October 15, 1967 (plaintiff's exhibit 112) was the "high incidense (sic) of splitting of Bond Ply roofs." An inter-office memo from Donegan in early 1966 (plaintiff's exhibit 165) discussed Bond Ply problems and stated that the major performance problem [moleruns] had not been associated with particular product characteristics or installation conditions; an inter-office memo from Franklin to Donegan (plaintiff's exhibit 162) in 1965 warned that Bond Ply problems would have to be solved if the product was to continue to sell. A memo from Rissmiller to Dingler mentioned attempts to improve Bond Ply tensile strength (plaintiff's exhibit 203). And in 1964, Rissmiller suggested the cause of buckling of Bond Ply sheets "was moisture absorption"—a problem with the product, not with environmental factors. (Plaintiff's exhibit 129). If the Celotex roofing experts did not bother to differentiate, then the distinctions cited at trial were probably sufficiently minor to allow admission of the evidence with the alleged differences being brought out on cross examination.

 Next, Celotex submits that the documents were more prejudicial than probative and thus should have been excluded under Rule 403.[77] Rule 403 requires the trial court to balance the probative value of the evidence against its prejudicial character. *United States v. Bowdach*, 501 F.2d 220 (5th Cir. 1974); *United States v. Byrd*, 352 F.2d 570 (2d Cir. 1965).

On the one hand is the probative force of these documents with regard to questions of knowledge, inadequate testing, and fraudulent state of mind. Some examples of the materials offered will illustrate their probativeness. Relating to fraudulent in-

tent, Dingler suggested in a memo that adhesion problems be examined "if this can be done without being overt."[78] Another Dingler memo, directed to Rissmiller, stated in reference to a roof complaint: "As usual this is a messy situation and will become even more so. Please exercise your usual diplomacy and avoid any unnecessary direct replies where possible."[79] Finally, on a 1964 letter purporting to reply to a memo which raised many disturbing problems concerning Bond Ply, there is stamped in large, bold letters, "Sell Bond Ply."[80] On the issues of knowledge and testing, the documents are replete with the pinpointing of problems, possible solutions, the lack of adequate test data, and suggested testing which was never conducted. Without a doubt, the documents are susceptible of jury persuasion on these issues.

Another factor to be considered in evaluating "probativeness" is whether the evidence was necessary to plaintiff's case. The question is whether the documents "sharpened" plaintiff's proof of intent and knowledge or were merely redundant. *United States v. Byrd*, 352 F.2d 570 (2d Cir. 1965). Without the introduction of these documents, Campus' causes of action for fraud and gross negligence might well have failed. Not only were these documents important for their literal contents but they were also crucial in eliciting testimony and in challenging the statements of Celotex's witnesses.

The main danger of prejudice from these documents lay in the possibility that the jury would consider the causes of the problems mentioned therein, to be causative of the failure of the Campus roof, which is a danger inherent in any of the exceptions enumerated under Rule 404(b). If the evi-

---

77. Rule 403, Federal Rules of Evidence, reads: Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

78. Plaintiff's Exhibit 171 is a memo from the desk of Dingler, March 23, 1966, reporting a

problem. Initials on the exhibit indicate that Rissmiller read the communication.

79. Plaintiff's Exhibit 187, an inter-office memo from Dingler to Rissmiller, October 7, 1966.

80. Plaintiff's Exhibit 136. This most interesting inter-office memo, dated October 27, 1964, indicates a plethora of problems with Bond Ply.

dence of prior complaints had not been limited to the issues of knowledge and intent, the danger would have been much greater for one might easily suspect that the jury would apply the evidence of these problems to the wrong issues. But plaintiff did not argue that the moleruns, wet rolls adhesion, and tensile strength were the cause of the failure. Campus' primary theory was that Bond Ply was so inadequately saturated with asphalt, that moisture penetration resulted, thereby causing the failure. These complaints, which were symptomatic of Bond Ply's unsuitability for use as a roofing system, put Celotex on notice of an inherent problem with its product. Since the causation argument of plaintiff was unrelated to the problems mentioned in the documents, the danger of prejudice resulting from confusion of the issues was minimized. Accordingly, the documents were properly admitted.

At this point it would be proper to consider Celotex's argument that the jury should have been instructed to limit their consideration of these documents solely to their determination of intent and knowledge. The general rule is that where one party makes a timely request for instructions limiting the evidence to its proper scope, such an instruction must be given. *Gross v. United States*, 394 F.2d 216, 222 (8th Cir. 1968), *cert. denied* 397 U.S. 1013, 90 S.Ct. 1245, 25 L.Ed.2d 427 (1970). Had Celotex requested such an instruction, this court would have gladly so instructed the jury at the time of the admission of the evidence, and once again in its jury charge after the close of the evidence. Nevertheless, despite Celotex's failure to request such an instruction, this court did instruct the jury to consider the evidence for purposes of the knowledge of a defect.

Celotex sought to exclude the evidence entirely through a general objection and failed to call the attention of this court to any specific limitation which it believed should be imposed upon the jury in applying the evidence to the issues. In a similar situation in *American Medical Association v. United States*, 130 F.2d 233 (D.C.Cir. 1942), *aff'd* 317 U.S. 519, 63 S.Ct. 326, 87 L.Ed. 434 (1943), it was stated:

> Even assuming that this evidence may have been relevant only in respect of the American Medical Association and that it was introduced for that purpose by the government, nevertheless, as appellant sought only to exclude it entirely, rather than merely to limit it to probative force, there was, consequently, no error in admitting it, in any event.

See also *Malatkofski v. United States*, 179 F.2d 905, 914 (1st Cir. 1950).

■ The rule requiring counsel to request the limiting instruction is a sound one, because the court cannot ascertain the meaning of an attorney's silence. An attorney may conclude that his client would be best served by silence on the matter, rather than by bringing emphasis to bear on the evidence. *Malatkofski v. United States, supra; Sica v. United States*, 325 F.2d 831, 836 (9th Cir. 1963), *cert. denied* 376 U.S. 952, 84 S.Ct. 970, 11 L.Ed.2d 972 (1964). Furthermore, in a long and complex trial, it is entirely possible for the court unintentionally to neglect to give the instruction. Since the jury was instructed in part as to its use of the evidence, and since counsel failed to request an instruction, and since plaintiff's theory of causation was so different that the potential for prejudice is minimized, this court is of the opinion that the failure to instruct at most constitutes "harmless error."

■ The standard governing the admissibility of evidence to show "intent" differs from that already discussed governing "knowledge." Since similar acts are being used to minimize the possibility of inadvertence, or in other words, to show that the odds are that repeated acts of the same nature are not accidental, the prior acts must be "substantially similar" to that one in question.[81] *Whiting v. United States,*

---

81. The South Carolina cases cited by Celotex are irrelevant since under *Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965), the Federal Rules of Evidence and federal law controls.

296 F.2d 512, 516 (1st Cir. 1961); *1 Wigmore, Evidence*, § 302 at 200 (3d ed. 1940). Nor do acts have to constitute a crime to be admissible to prove "intent". *United States v. Senak*, 527 F.2d 129 (7th Cir. 1975), *cert. denied* 425 U.S. 907, 96 S.Ct. 1500, 47 L.Ed.2d 758. See also *1 Wigmore, Evidence*, § 216 at 712–18 (3d ed. 1940).

With regard to intent, Celotex raises the same issues of probativeness and prejudice that it raised on the issue of knowledge. As previously pointed out, the evidence was highly probative of the "intent" of Celotex to protect its market position in spite of its knowledge of severe problems with Bond Ply.

Finally, it is noteworthy that the inter-office memos themselves point out that the problems were with Bond Ply rather than with types of decks, geography, etc. For this reason, the evidence was admissible on the issue of "intent".

### Corporate Test Reports And Inter-Office Memoranda

In support of its position that certain test reports and Celotex memoranda should have been excluded for lack of "substantial similarity," defendant relies heavily on the case of *Renfro v. National Cash Register Co.*, 552 F.2d 1061 (4th Cir. 1977). Defendant Renfro prosecuted a counter-claim against NCR for breach of express and implied warranties and for fraud. The issues arose from negotiations which culminated in the leasing by Renfro of a data processing system from NCR. During negotiations, NCR was testing prototypes and production models of the unit which was eventually leased by Renfro. There were problems experienced with both types of models during testing, and Renfro sought to introduce this evidence to prove breach of the warranties and NCR's knowledge that the computer was not "reliable" as represented to Renfro. Renfro also sought to introduce into evidence "performance goals" set by NCR to show that the systems had not met the company standard for reliability and certain reports on post-marketing tests known as "C" tests.

The trial judge in *Renfro* excluded the evidence of testing difficulties with the models insofar as it was to be used for proving that the leased system was "unreliable." Noting the substantial differences between the prototype and the model leased to Renfro and the vastly different environmental conditions under which the testing took place, the Fourth Circuit found that the exclusion was not an abuse of discretion. Said the court:

There was no error in the finding of the Court that the Appellant had failed to meet this burden. The Final Report on the "B Test" emphasized that "[t]he 615-100 System [tested] greatly deviates from a production system." Report at 1. Numerous deviations between the prototype and production model were listed for every major component tested; in some instances, the dissimilarities were so great that major units could be tested only for interface capability. *Id.* at 22. Furthermore, the conditions under which the prototype was tested differed drastically from an operational environment; *see*, e.g., Final Test Report at 10 (tests on processor). Plainly, under these circumstances, this Court cannot say that the trial judge was erroneous in concluding that Appellant had failed to show similarity between the test conditions and conditions at Renfro's facility.

552 F.2d at 1066.

This court perceives two substantial differences between this suit and the *Renfro* "B" tests. First, the differences involved in the Bond Ply roofs were much less substantial than those in the computers. Second, the evidence in this case was not introduced to prove "cause" as in *Renfro*: a lower standard of "similarity" is required where mere knowledge is in dispute. See Weinstein & Burger, *Weinstein's Evidence*, § 404[11] at 404–76. (This is also implicit in part IV of *Renfro*).

Celotex contends that *Renfro* is authority for excluding evidence of the failure to meet certain performance guidelines. While Celotex does not specify what performance guidelines should be excluded,

presumably it is referring to the evidence that Bond Ply did not measure up to the tensile strength standards for built-up roofing. In *Renfro*, the evidence was excluded because the goals were merely a target, were set artificially high, and were related not to an industry standard but to NCR's concern for quality control. *Id.* at 1067. None of these factors was present here; Celotex's documents reflect a concern over meeting the level of tensile strength generally prevalent in its industry. Of even greater importance, the goals were not introduced to prove a "defect", as in *Renfro*.

■ Post-marketing test results may also be admitted to prove knowledge and intent. Celotex's reliance on *Renfro* is misplaced since the "C" test results were admitted for precisely this purpose in *Renfro. Id.* at 1067.

■ Celotex's final argument that these documents constitute subsequent remedial measures under Rule 407,[82] is groundless for two reasons. First, evidence of similar acts used to prove "intent" may postdate the event in question since the purpose is to prove lack of inadvertence. The more times something is repeated, whether before or after an event, tends to negate the event's inadvertence. *Roe v. United States*, 316 F.2d 617, 621 (5th Cir. 1963); *Shreve v. United States*, 103 F.2d 796, 803 (9th Cir. 1939). Second, the "event" and the "remedial measures" to which Rule 407 addresses itself, pertain to the failure of the roof, not to the marketing of the product. Thus those documents from 1964 through 1968 would not be "subsequent" in this case.

**82.** Rule 407, Federal Rules of Evidence, reads as follows:

> SUBSEQUENT REMEDIAL MEASURES
> When, after an event, measures are taken which, if taken previously would have made the event less likely to occur, evidence of the subsequent measures if not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control,

## EXPRESS WARRANTY

Celotex objected to the submission of the issue of an express warranty to the jury arguing that there was no express warranty, that there was no privity between Celotex and Campus, and that there was no reliance upon the warranty.

■ Celotex advertised its Bond Ply 220 INS roof as a "20-year bond" roof.[83] Campus' express warranty theory is that Celotex represented the Bond Ply roof as being one which could be expected to last 20 years, the same length of time a four-ply roof would be expected to last.[84] Celotex argues that the term "20-year bond" signifies nothing more than a willingness to issue a bond on the roof for 20 years provided certain construction specifications are met. However reasonable one considers the interpretation presented by Celotex, there was certainly sufficient evidence for the jury to conclude that Celotex and its customers understood the roof was being represented as having an approximate life expectancy of 20 years. Mr. Heppert, an engineer for Campus who recommended to Mr. Zuckerman that Bond Ply be used, testified that "20-year bond" led him to believe the roof would last 20 years:

Q. What is this, what's the language right above the heading, the blue heading on the specifications?

A. That says specification number 220 INS, which I have since learned is the Barrett designation of this roof. Obviously, I do not remember that for 9 years, but I knew it was a bond-ply roof. And it says under that "incline maximum is 3 inches per foot."

or feasibility of precautionary measures, if controverted, or impeachment.

**83.** The Series 200 Barrett Bond Ply Roof is shown in Plaintiff's Exhibit 82 at page 14. The specifications are set forth at page 38 n. 46 *supra.*

**84.** There has never been any contention by Campus that it relied upon the brochure known as "One Plus One Equals Four." This document is relevant only to Fort's cross-claim for fraud.

Q. Read on, the blue language. It's written in blue right there?

A. It says, "20-year bond."

Q. Twenty-year bond. Now as an experienced roofer, what did that mean to you, Mr. Heppert?

A. It meant to me that it was a roof that I could normally expect to last 20 years.

Q. Is that contrary to what you earlier expected?

A. I expected to find a 10-year roof.

Q. Did you believe that statement 20-year bond?

A. Yes, I did.[85]

Mr. Stafford, Campus' expert on roofing, testified that "20-year bond" has an ambiguous meaning in the roofing industry, with some people attaching a greater significance to this term than Celotex would. Although some use the term "20-year roof" to mean only a roof bondable for 20 years, Stafford said, "it would certainly indicate to me that this was a roof that could be expected to last sometime around the range of 20 years, but not specifically necessarily 20 years."[86] He added, "If someone used that term to me, it would indicate to me that they were anticipating in a range of 20 years."[87]

The Campus employee who was responsible for the decision to substitute the Bond Ply roof, Mr. Zuckerman, testified that the roof was sold to him as a 20-year, four-ply, tar-and-gravel roof. He expected it to last 20 years.[88]

Moreover, Celotex's own witnesses testified that the company interpreted the term as meaning the roof should last 20 years. Mr. McClellan, Celotex's salesman, stated that a 20-year bond roof means ". . . it should last 20 years; it is more or less a standard in the industry."[89] The product manager at Celotex, Mr. Brasher admitted in his deposition published at trial, "that we were to sell it as a 20-year system competitive to a four-ply system."[90] According to Mr. Butterfield, Bond Ply "should give you the 20-year period that we allowed for it at that time."[91] Finally, Mr. Franklin indicated that Celotex expected the roof to last twenty years.[92]

Without doubt, the question of whether one could reasonably believe that Celotex was warranting that Bond-Ply would last 20 years more or less, is a difficult one which bears on a crucial issue. Fortunately, it is not the function of this court to decide that issue, for in their wisdom, the architects of our judicial system have left that question to a jury of twelve persons.[93] Certainly this court makes no claim to greater insight than that derived from the deliberations of 12 jurors.[94] The only matter which this court must decide is whether the jury's conclusion that an express warranty was made, was a fair and reasonable one supported by the evidence.

The jury heard testimony that Barrett (Celotex) expected the roof to last 20 years; that it would be reasonable in the roofing industry to interpret "20-year bond" as an assertion that the roof would last for that period; and that Campus so interpreted this term. An express assertion which becomes

---

85. Testimony of Heppert, Transcript at 407.

86. Testimony of Stafford, Transcript at 1370.

87. *Id.*, Transcript at 1372.

88. Testimony of Zuckerman, Transcript at 290.

89. Testimony of McClellan, Transcript at 1795.

90. Testimony of Brasher, Transcript at 1442.

91. Testimony of Butterfield, Transcript at 1082.

92. Testimony of Franklin, Transcript at 1062.

93. The experience in the District Court of South Carolina has been that the six-man jury, product of random selection, is more often than not a "one-man" or "two-man" jury.

94. On whether twelve heads are better than one, Justice Holmes wrote:

> . . . the meaning of leaving nice questions to the jury is that while if a question of law is pretty clear we can decide it, as it is our duty to do, if it is difficult it can be decided better by twelve men taken at random from the street.

Holmes, *Law in Science and Science in Law*, 12 Harv.L.Rev. 457.

a basis of the bargain is a warranty, and that is what the jury found in this case. While this court finds itself unable to say with any certainty that there was or was not an express warranty by Celotex, there nonetheless was ample evidence from which a jury could reach the conclusion that there was such a warranty. Even were this court to lean in favor of Celotex's argument, a mere "leaning" is not sufficient to overturn the jury's verdict. This is precisely the situation where "one head" must defer to the greater wisdom of "twelve."

Assuming the existence of a warranty, Celotex contends that a paragraph in the Barrett catalog acts as a disclaimer of warranty.[95] The disclaimer language on which Celotex relies, appears some 12 pages away from the express warranty upon which Campus bases its action. There is no device used to draw attention to this disclaimer, and, although "conspicuousness" is not an issue with an attempted disclaimer under the UCC, this hidden disclaimer does underscore one of the policy reasons for the UCC position that express warranties cannot be disclaimed.

South Carolina has rejected the modified version of disclaimers in the 1962 Uniform Commercial Code revision,[96] opting for the strict 1952 provision entitled "Exclusion or Modification of Warranties." Section 36–2–316(1), Code of Laws, 1976, reads as follows: "If the agreement creates an express warranty words disclaiming it are inoperative." Under this approach, words creating an express warranty must be read in isolation from the other language and cannot be effectively disclaimed in any other part of the contract. See S. C. Reporter's Comments, § 36–2–316. The South Carolina courts have yet to face this particular issue.

However, the statutory language seems clear. In order to protect buyers from hidden disclaimers, any disclaimers in conflict with an express warranty are ineffective. See *Walsh v. Ford Motor Co.*, 59 Misc.2d 241, 298 N.Y.S.2d 538 (Sup.Ct.1969). The jury, having read the words "20-year bond" in isolation from the disclaimer language under § 36–2–316(1), found an express warranty which could not be disclaimed.

The *privity argument* advanced by Celotex need not be addressed further as this court has already held in the Statute of Limitations section that privity is not required in South Carolina for an express warranty.[97] Celotex's final argument on express warranty alleges a lack of reliance by Campus on the representations of Celotex.

Initially, this argument assumes that reliance is required in South Carolina for recovery on express warranty. Under the Uniform Sales Act, § 12, the plaintiff could recover on express warranty if "the buyer purchases the goods relying thereon [referring to the warranty] ...." The Uniform Commercial Code, § 36–2–313(1), requires only that the promise or affirmation become "part of the basis of the bargain." Furthermore, Official Comment No. 3 to § 36–2–313 reads:

> In actual practice affirmations of fact made by the seller about the goods during a bargain are regarded as part of the description of those goods; hence no particular reliance on such statements need to be shown in order to weave them into the fabric of the agreement.

This is an open question in this state, and this court has no desire to usurp the function of the South Carolina Supreme Court

---

**95.** Plaintiff's Exhibit 82, Barrett's "Build-up Roofing Systems Manual—1967", at 2 states:

Barrett will not issue, in lieu of such guaranty bond, letters of certification or any other guaranties or warranties whatever on Built-up Roofing jobs.

**96.** The 1962 approach, set forth here, looks to the entire contract to construe disclaimer-type language: § 2–316 provides:

Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this Article on parol or extrinsic evidence (§ 2–202) negation or limitation is inoperative to the extent that such construction is unreasonable.

**97.** See discussion at 80–82 *supra*.

to interpret South Carolina statutes. Since there was ample evidence from which the jury could conclude that Campus relied upon the warranty made by Celotex,[98] there is no reason for this court to address this issue.

Celotex correctly points out that the man who made the decision to buy Bond Ply, Mr. Zuckerman, had no direct contact with Celotex or its representatives. However, he did receive from Celotex the Barrett catalog which he gave to Mr. Heppert to use in preparing his recommendation about the roof. He also had the letter from Kahn suggesting Bond Ply, which was sent as a result of assertions by Celotex's salesman, Mr. McClellan, that Bond Ply was suitable for this job.

Heppert was the man who actually relied on the term "20-year bond." He testified that he looked up the 220 INS specification[99] in the Barrett catalog since he was dubious about the existence of a two-ply roof which was the equivalent of a four-ply roof.[100] He found that there was a Bond Ply roof, consisting of two plies of coated felt, bondable for a term of 20 years.[101] Heppert testified that he took the term "20-year bond" to mean the roof would last 20 years.[102] As a matter of curiosity he checked the comparative weights of the two systems and found that they were compara-

ble. Based on these calculations, on the assertion that the roof would last 20 years, and on the reputation of Barrett, Heppert recommended the roof to Zuckerman; and based on that recommendation, Zuckerman ordered the roof.[103] Thus, there was ample evidence of reliance by Campus.

## FRAUD

The issues which are raised in defendant's brief on this subject need be addressed only briefly. Campus and Fort's theory in the fraud action was that Celotex made a representation as to the longevity of its product, Bond Ply, that it was either actually aware that Bond Ply would not perform to its representation or that it acted in reckless disregard of whether it would or would not so perform. As to Fort, which was a second generation roofer, the only evidence is that Celotex never intimated any of the multitude of problems associated with bond-ply or that it had no knowledge of the life expectancy of the roof system. Indeed Fort maintains Celotex made a conscious effort to keep this information from it, and deliberately continued to promote its product. This theory was supported by much testimony and documentary evidence on the representation and on the defendant's knowledge thereof as well as on defendant's intent.[104] In its defense, Celotex argues

---

**98.** Testimony of Heppert, Transcript at 403–09; Testimony of Zuckerman, Transcript at 110.

**99.** See discussion *supra* at 97.

**100.** Testimony of Heppert, Transcript at 406–408.

**101.** *Id.,* Transcript at 406–407.

**102.** *Id.,* Transcript at 407.

**103.** Testimony of Zuckerman, Transcript at 110; Testimony of Heppert, Transcript at 403–409.

**104.** See discussion under express warranty, *supra* at 96. Of particular import is plaintiff's exhibit 126, an inter-office memo from Donegan to Franklin dated October 22, 1963. Its contents are so telling that it bears reproducing in part:

As to the more important criterion, anticipated life, we have no service basis on which to recommend a construction as simple as this

for a 20-year period. As you are aware, we installed such a roof on the office building at Frays Ferry this summer and application proceeded without difficulty. This roof was over a wood deck and comprised one rosin, one # 15 asphalt felt nailed dry and two "VAPORBAR's" stuck. All moppings and the top pouring were of "ANCHORBOND" asphalt and top finish was slag. No two-ply construction over insulation or concrete has been tried.

Practically speaking, the question becomes simply that of whether or not a two-ply roof can be expected to last 20 years. If we consider the top pour and slag as the primary barrier against weathering, then there is no difference between this proposed construction and a conventional 5-ply job. Resistance to structural movement and other stresses to which the roof is subjected is provided by the felts, and herein we become deficient according to accepted standards. Are these standards correct? How were they arrived at? I suspect witchcraft and tradi-

that new products have developmental problems, that to apprise the potential purchaser of all problems would discourage sales unnecessarily, and that these problems in any case were not present on the Campus roof. Obviously, the jury chose to believe Campus and Fort.

██ The admissibility of documents to prove fraudulent intent has already been fully discussed. All that need be repeated here is that the South Carolina cases cited by Celotex in support of excluding these documents are irrelevant, since the admission of these documents is a question of federal law under *Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965).

Celotex also states that the previous acts were not shown to be fraudulent and that there was no showing of "preparation" as required under Rule 404. First, acts do not have to constitute a crime, to show intent. *United States v. Senak*, 527 F.2d 129 (7th Cir. 1975), *cert. denied* 425 U.S. 907, 96 S.Ct. 1500, 47 L.Ed.2d 758. Second, the cases requiring "preparation" relate to the use of similar acts to prove the commission of the crime charged. This was not the purpose here.

### MOTIONS FOR MISTRIAL

Celotex moved for a mistrial during the trial on the basis of the introduction of documents previously discussed. For reasons which have been expressed at length earlier in this opinion, the facts fail to support that portion of their post-trial motion. Additionally, Celotex has moved for a new trial on the basis of two events which occurred at trial which prompted it to move for a mistrial.

██ During the course of his testimony, Mr. Stafford indicated that, some years earlier while working for Johns-Manville Roofing Company, he had concluded that the company should not market a system such as Bond Ply because he felt it was not an effective roofing system. When it became the turn of counsel for defendant Fort to cross examine this witness, counsel immediately walked up to the witness stand, and stuck out his hand, which the witness took. While shaking the witness' hand, Fort's counsel said:

> Mr. Stafford, good morning, sir, and congratulations, it may not be readily apparent to you at this moment as to why I did that, but I want to go back in history a little bit with you, if I may. Congratulations is for all the consumers and roofers in the world that no longer have to deal with Bond Ply.[105]

Counsel for Celotex immediately moved for a mistrial claiming that the exchange was highly prejudicial to his client's case.

The valuation of this conduct and the assessment of its impact upon the jury in passing upon a motion for mistrial is peculiarly the function of the trial court. *Slade v. Slade*, 439 F.2d 130, 131 (9th Cir. 1971); *Zeigler v. Seaboard Coastline R. R.*, 437 F.2d 80 (5th Cir. 1971); *Arkwright Mutual Insurance Co. v. Philadelphia Electric Co.*, 427 F.2d 1273, 1277 (3rd Cir. 1970). In this situation, this court rebuked counsel and admonished the jury to disregard his re-

tion rather than sound technology and am inclined to waive these requirements in the interests of furthering development of this two-ply proposal.

Although the document refers to a "Two-Ply 'Vapor Bar' Roof", Mr. Rissmiller indicated it to be the same as Bond Ply. Transcript at 668, 670.

Further evidence expanding upon the knowledge of Celotex is found in the following:

A. Exhibit 135 shows that in September of 1966, Celotex questioned its written specification as to the bond-ply system due to the inherent weakness therein and states Celotex knowledge that they "had better find out".

B. In 1967, Celotex knew that its bond-ply system must have greater strength to overcome its field problems. Exhibits 112 and 112–A.

C. Particularly as to the intent and attitude toward its approved roofers, exhibit 149, is of course the scapegoat memorandum.

D. Exhibit 191 indicated that Celotex knew its bond-ply system was not time proven and from a technical point of view the old four-ply system was far better and until it knew more about its new system that making a buck should not be the sole criteria of what they were to do.

105. Transcript at 1248.

marks.[106] Even assuming that the .comments of Fort's counsel were prejudicial, this court adequately removed any prejudice by its instruction to the jury. See *Standard Oil of California v. Perkins,* 347 F.2d 379 (9th Cir. 1965); *Nevels v. Ford Motor Co.,* 439 F.2d 251 (5th Cir. 1971); *Pasotex Pipe Line Co. v. Murray,* 168 F.2d 661 (5th Cir. 1948).

When this court analyzes the effect of this act upon the jury, it becomes apparent that minimal prejudice resulted. Nothing new was introduced into the trial by way of the attorney's comments, his message being simply that he thought Bond Ply was a bad product. Of course, that is the whole point of Fort's case and is a fact of which the jury was fully aware. Any comments by counsel would have been taken with a grain of salt by the jury panel. This court is adequately assured that the curative instruction was sufficient in this case.

Well into the second week of the trial, the following exchange took place during the examination of the president of Fort by his counsel:

Q. Now, Mr. Fort, as far as your cross-claim against the Celotex Company is concerned, are you limiting what you are asking these ladies and gentlemen of the jury for in damages to this one particular job?

A. Yes, sir.

Q. All right, and why are you doing that?

A. I don't have any idea what they are going to be. As I said, we've got eight to ten jobs that are potential failures, and I don't know. There is no way of telling.[107]

Celotex immediately objected to this exchange. It is the contention of Celotex that this was an intentional and calculated act designed "to elicit sympathy for Fort and create in the minds of the jurors the thought that if they did not do something for Fort in the instant case it might well have adverse repercussion in the ten other

ones." Brief of Celotex at 201. At the time of this remark, this court was not of the, opinion that it was an intentional device. After examining the transcript, this court continues in that opinion. Furthermore, the conclusions which can be inferred from the last statement of Mr. Fort are ambiguous. One might infer, as Celotex does, that something needs to be done in this case. Or one might infer that Mr. Fort was simply informing the jury that they should consider only this lawsuit and not any others which might be brought in the future. Although the remark was improper, this court does not feel any prejudice was done which would require a retrial of the two weeks' experience. The court immediately instructed the jury to disregard the statement and to confine their deliberations to the present action. Since this was a two-week trial, since the inferences from the remark did not inevitably lead to a prejudicial conclusion, and since this court went to some effort to cure the mistake, the motion for mistrial was not granted.

Of further consideration is the fact that the jury found no actual damages on Fort's behalf, a conclusion tending to negate any inference that the jury was concerned about his damages from other cases. The Supreme Court of South Carolina adequately summed up this court's attitude toward this problem in the case of *Smoak v. Seaboard Coastline R. R.,* 259 S.C. 632, 640, 193 S.E.2d 594 (1972), where it stated:

The defendant is not entitled to a perfect trial but only a fair trial. Hardly any case is completed without some flaw. If a new trial was required everytime a flaw or a mere possibility of prejudice occurred, litigation would be unduly prolonged. Our court has held many times that such matters are basically for the sound discretion of the trial judge.

## CHARGES TO THE JURY

 During its charge to the jury on fraud, this court made the following state-

---

**106.** Transcript at 1250. The court inquired of the jury if any juror would have difficulty disregarding the statement. There was no response. *Id.*

**107.** Transcript at 1712, exchange between Mr. Fort and Mr. Chappell.

ment relating to the methods by which fraud can be proved:

> Fraud may be deduced not only from the deception or false representation, but from facts, incidents and circumstances, which may be trivial in themselves, but decisive in a given case of fraudulent design.[108]

Celotex contends that this charge was in error in that it related solely to a fraudulent breach of contract action and not one for fraud and deceit. The prejudice, Celotex asserts, is that the standard of proof for a fraudulent breach of contract action is different from the standard of proof for a fraud action, and that this court charged the jury with both.[109]

The charge set forth was taken from the case of *Henderson v. Capital Life & Health Ins. Co.*, 199 S.C. 100, 18 S.E.2d 605 (1942). *Henderson* was an action for breach of contract accompanied by a fraudulent act. However, the language in *Henderson* which this court charged was a direct quotation from *Cook v. Metropolitan Life Ins. Co.*, 186 S.C. 77, 194 S.E. 636 (1938), an action for fraud and deceit.

It is quite obvious that the meaning of the language charged by this court is that fraud can and almost always must be demonstrated by a succession of events or by circumstances any one of which standing alone would appear innocuous—this is the very nature of proof by circumstantial evidence. *Cook*, in fact, has been referred to as authority for that statement. *Gary v. Jordan*, 236 S.C. 144, 113 S.E.2d 730 (1960). Celotex, for another proposition of law, cites as authority *Carter v. Boyd Construction Co.*, 255 S.C. 274, 178 S.E.2d 536 (1971). The first phrase of this opinion by Mr. Justice Bussey states: "In this action for fraud and deceit ...." The exact language to which Celotex objects, is quoted by Mr. Justice Bussey at 178 S.E.2d 539. Further, that language is used in the *Carter*

case in exactly the same context as it was in this case, i. e., to determine the state of mind of the defendant.

The contentions of Celotex are totally without merit. First, this charge to the jury did not set out a new standard of proof but simply stated a manner in which fraud might be proved. The correct standard of proof, that of clear, cogent, and convincing evidence, was charged to the jury in the initial charge, and was repeated at the time the jury requested further instructions.[110] Second, the nine elements required to prove fraud in South Carolina were repeated to the jury twice in the initial charge, and at the jury's request were repeated by the court three times after their deliberations had begun. There is no doubt in this court's mind that the jury was aware of the elements of fraud, and of the high standard of proof applicable to that cause of action.

Celotex argues that Plaintiff's Request to Charge No. 2 was not "adjusted to the evidence." This court instructed the jury as follows:

> Also, the manufacturer has a duty to adequately warn of foreseeable and latent defects known, or which in the exercise of ordinary care could have been known, to exist in the product which could result in damages to the person or corporation who used the product for the purpose for which it was intended.[111]

Celotex's argument is framed in the alternative: If the 220 INS system was "the product," it was not used, and thus there was no relationship between the "product" and the evidence; if the "product" is considered to be the Bond Ply coated felt, these were not shown to be defective. Finally, the argument is that, even if there was a defect in this roof, the defect related only to flexural strength and consequent fatigue which it is contended was never known to Celotex.

---

108. Transcript at 2457–58.

109. Contrary to the claim of Campus, Celotex did make a timely objection to this charge. Therefore this court will consider the issue. Transcript at 2479.

110. Transcript at 2487.

111. Transcript at 2448–49.

This argument is not persuasive for several reasons. The uncontradicted testimony shows that the bid for constructing the roof was for Barrett's 220 INS specification and that it was so accepted. However, it is also uncontradicted that there was a deviation from that specification. The only area of controversy concerned the materiality of that deviation. Mr. Stafford testified that this deviation was not material to the failure of the roof.[112] Celotex attempted to controvert this testimony. However, the jury chose to believe Mr. Stafford. More importantly, it should be remembered that Fort's employee testified, without contradiction, that Mr. McClellan, the local representative of Celotex allowed him to use the one-on-one application since Fort had been experiencing trouble with the shingle-type application on previous jobs.[113] The contention that the sheets were not defective is not supported by the evidence. While the evidence showed that the sheets of Bond Ply were physically as the manufacturer had intended them to be and thus not "defective" in that sense, Mr. Stafford testified that these sheets had inherent and latent properties which made them unsuitable for use as a waterproofing membrane.[114] Thus, although the sheets were properly made, the jury found that they were inherently defective.

Celotex maintains that the court charged a duty to give warning "when a defect which makes a product *hazardous to users* becomes known to the manufacturer after the product has been put on the market." The true quotation, as borne out by the transcript, is: "The duty to give prompt warning arises when a defect which makes a product *hazardous to use* becomes known to the manufacturer after the product has been put on the market."[115] The phrase "hazardous to users" might suggest some danger to those who use the product, but the phrase, "hazardous to use," as employed by this court, is simply synonymous with defective for the purpose for which the product is designed and manufactured. The case of *Carolina Home Builders v. Armstrong Furnace Co.*, 259 S.C. 346, 191 S.E.2d 774 (1972) is precisely on point. In that case, which involved only property damage due to a defective product, the court strongly stated that a manufacturer has a duty to warn of foreseeable and latent defects in the product which would cause damages to a person using the product for the purpose for which it was intended. Since the charge in question goes to this point, the objection is without merit.

The final objection by Celotex to the jury charge concerns the following charge taken from *Gardner v. Q. H. S., Inc.*, 448 F.2d 238 (4th Cir. 1971):

> In determining whether one has knowledge of defects or should have knowledge of defects, if any, in his product, you may consider prior complaints describing substantially similar experiences. Not as to others, but substantially similar experiences, provided those experiences were brought to the attention of the manufacturer prior to placing a product on the market, particularly the product for which defects were claimed in this case and not in any other case.[116]

Celotex contends that *Gardner* dealt only with the issue of foreseeability of harm in view of a product's intended use and that it is not authority for the use of evidence in this case to prove Celotex's knowledge of prior complaints.

Basically, Celotex contends that its knowledge of prior complaints is not relevant to any issue in this case. This court has already discussed that issue, holding that the jury's consideration of the prior complaints could have led to its finding that Celotex had knowledge of these problems and failed to warn Campus and Fort of them or failed to take action to correct the

112. Testimony of Stafford, Transcript at 1246.

113. Testimony of Watts, estimator for Fort, Transcript at 1704 and 1648. McClellan does not deny this, Transcript at 1831.

114. Testimony of Stafford, Transcript at 1186.

115. Transcript at 2449.

116. Transcript at 2450–51.

problems. Moreover, Celotex's reasoning that *Gardner* is limited to foreseeability of intended use is misguided. *Gardner* specifically stated that complaints or experiences were admissible to show the defendant's knowledge of these problems. 443 F.2d at 244.

■ As stated in *Gardner*, the key issue to be resolved by the proof of knowledge is whether the manufacturer knew or should have known that a product was or was not likely to be dangerous for the use for which it was supplied. Since there was evidence that the problems complained of were present on the Campus roof, the charge was relevant to the issue of knowledge as it relates to the duty to warn. Furthermore, whether these same experiences should have been known by Celotex prior to 1968 is relevant as to the issue of fraud bearing on the representation made, as to the falsity of the representation or to Celotex's reckless disregard of its truth or falsity, and as to the intent that the representation be acted upon. The contention that the documents dating from the 1970s (after plaintiff's roof had been constructed) cannot support a finding of fraud in 1968, is erroneous. The proof of intent is dependent upon the doctrine of chances eliminating the possibility of innocent intent by multiplying instances of the same result until it is perceived that this element cannot explain them all. 2 Wigmore on Evidence, § 302 (3rd Ed. 1940). Because it is based on the doctrine of chances, proof of intent is relevant whether it occurs before or after the event in question. The crucial issue is the negating of inadvertence or any other innocent explanation.

■ The final contention of Celotex is that the charges given, coupled with the action of the jury, indicate that the jury was obviously confused. The court does not agree that this conclusion necessarily follows from the facts. It is obviously difficult for anyone, especially lay persons, to remember a list of nine elements. The jury's request that the court charge the

nine elements of fraud three times after beginning their deliberations, is also indicative of conscientiousness, rather than confusion. Celotex seems to find an element of confusion in the jury's request that the court charge them concerning "direct and indirect fraud." This court is of the opinion that the concern of the jury most probably lay in the area of proof of fraud by circumstantial evidence and, in the absence of the actual knowledge of the falsity of representation, defendant's action in reckless disregard of the truth or falsity of the representation. Those areas were recharged as were the nine elements of fraud. This court also twice instructed the jury that there was no charge on direct and indirect fraud.[117]

## COMPENSATORY DAMAGES

Celotex takes issue in several particulars with the amount of compensatory damages awarded, and assigns to this court as error the allowance of same.

■ Celotex asserts error in this court's "permitting the jury to base damages upon plaintiff's evidence of its purchase of the installation of approximately 50 additional roof drains of a cost in excess of $10,000." Campus contends that these expenses were incurred in a good faith attempt by plaintiff to mitigate its damages, which if believed by the jury, would be a recoverable expense. Celotex claims that the drains were not installed to remedy a defect caused by the Bond Ply system. In examining the transcript, one should note that Campus originally asked for compensatory damages of $219,574.97,[118] while the jury award was $208,000. It is arguable, although by no means certain, that the jury did not include the drains in their verdict for actual damages. This court will not presume to go behind the jury's verdict where they may have already excluded the amount of the drains.

The amount of compensatory damages included the sum of $105,653.37, which was

---

117. Transcript at 2488 and 2489.

118. Transcript at 2304.

the cost of the new four-ply roof which had been installed in place of the defective Bond Ply roof. Celotex contends that to allow the entire amount as compensatory damages would not realize the goal of making a person "whole"; rather it would have the effect of making Campus "well off". There was evidence in the form of testimony by Stafford, which was not contradicted, that the cost of a four-ply roof should be between $4.00 and $4.50 more per square (100 square feet) than the cost of a two-ply system. Celotex argues that Campus, having purchased the cheaper system, is not entitled to be reimbursed for the complete cost for a new, different and much more expensive system than the one initially purchased.

■ This argument fails to focus on what was actually purchased in 1968. Campus did not originally specify a two-ply roof, but rather a four-ply roof which would keep its warehouse dry for some 20 years. It was only upon the urging of its contractor (who acted at the urging of Celotex's salesman) that Campus changed its specification to a two-ply system. When the Bond Ply system failed, Campus installed a system which would perform according to its original specification. Since Campus was seeking a 20-year roof, rather than a two-ply system originally, the jury did not err in awarding damages to Campus for the amount which it cost to purchase a replacement system which offers the same protection which Campus originally sought.

■ Finally, Celotex contends that it is due a discount because the roof in question gave five years of satisfactory service, or in other words, performed satisfactorily for 25 per cent of its estimated life. After examining the amount of the jury verdict, this court finds that Celotex is entitled to relief. There is no dispute in the record that Campus received satisfactory performance from its roof for a number of years. In other words, the dispute is as to the cost of the new roof. The roof in question was found by the jury to have been represented as a 20-year roof, more or less. It would not prejudice either party for this court to conclude for the purposes of this issue that the roof could reasonably be expected to last 20 years. The exact length of satisfactory service is also incapable of precise determination. Mr. Zuckerman testified that the problem started with the leaking in 1973. By December of 1973, Mr. Zuckerman had been called down to inspect the situation.[119] The roof and building were completed some time in 1968. It is reasonable to assume that leaks were occurring for some time prior to December, 1973. A reasonable estimate of the time of satisfactory service is five years. Thus it appears that Campus received the benefits of the Bond Ply roof for approximately 25 per cent of its useful life.

In order to accomplish justice, it is necessary that the judgment for actual damages be reduced by 25% of the cost of the roof, or $26,413.34. The practice of remittitur, long accepted by the Supreme Court,[120] allows a court to condition denial of a motion for a new trial upon plaintiff filing a remittitur in a stated amount. See 11 *Wright & Miller, Fed. Pract. & Proc.* § 2815. Since the jury award clearly exceeds that amount which the jury could legally award, this court directs plaintiff to file a remittitur in the amount of $26,413.34, or in the alternative, this court will be forced to grant the motion for a new trial. Furthermore, by limiting the remittitur to that amount which is "clearly excessive," plaintiff is not deprived of his right to a jury trial. *Dimick v. Schiedt,* 293 U.S. 474, 55 S.Ct. 296, 79 L.Ed. 603 (1935).

## PUNITIVE DAMAGES

The existence of two punitive damage verdicts in this case raises the controversial

**119.** Testimony of Zuckerman, Transcript at 120.

**120.** E. g. *Northern Pac. R. Co. v. Herbert,* 116 U.S. 642, 646, 6 S.Ct. 590, 592, 29 L.Ed. 755 (1886); *Arkansas Valley Land & Cattle Co. v. Mann,* 130 U.S. 69, 72, 9 S.Ct. 458, 32 L.Ed. 854 (1889); *Linn v. United Plant Guard Workers of America, Local 114,* 383 U.S. 53, 65, 86 S.Ct. 657, 664, 15 L.Ed.2d 582 (1956).

issue of the wisdom of awarding punitive damages where there exists the possibility that multiple plaintiffs may recover multiple punitive damages verdicts against the same defendant in the future. Against the need for punitive damages to deter proscribed behavior, manufacturers have raised the specter of "overkill" where a mass manufacturer suddenly faces continuing liability in punitive damages for a management decision which affected hundreds or thousands of potential plaintiffs. The court has been fully briefed on the policy issues and constitutional problems involved with the award of multiple punitive damages.

*Punitive Damages In South Carolina*

■ That the State of South Carolina approves of punitive damages is beyond dispute. Recognition of the doctrine in South Carolina dates back to the 18th century, when exemplary damages were awarded in the case of *Genay v. Norris*, 1 S.C.L. (1 Bay) 6 (1784).[121] In the more recent case of *Rogers v. Florence Printing Co.*, 233 S.C. 567, 106 S.E.2d 258 (1958), the Supreme Court scanned 200 years of case law in this state before concluding that punitive damages are part of the public policy of South Carolina. 233 S.C. at 574, 106 S.E.2d 258.

South Carolina, as do most other jurisdictions, requires misconduct above and beyond mere negligence or gross negligence to entitle a plaintiff to punitive damages. In the case of *Cox v. Coleman*, 189 S.C. 218, 200 S.E. 762 (1938), the Supreme Court stated: "There must be malice, ill will, a conscious indifference to the rights of others, or a reckless disregard thereof to justify an award of punitive damages." *Id.* at 221, 200 S.E. 762. *Accord, Stonehocker v. General Motors Corporation*, 587 F.2d 151, 158 (4th Cir. 1978). In later cases, the Supreme Court declared that a party may be entitled to punitive damages when he proves: "Wanton, willful or malicious invasion of one's rights." *Gilbert v. Duke Power Co.*, 255 S.C. 495, 179 S.E.2d 720 (1971); *Hinds*

*v. United Ins. Co.*, 248 S.C. 285, 149 S.E.2d 771 (1966).

While punitive damages will not be awarded for mere gross negligence, negligence which is "so gross or reckless of consequences as to imply or assume the nature of a wantonness, willfulness, or recklessness" will support an award of punitive damages. *Hicks v. McCandlish*, 221 S.C. 410, 415, 70 S.E.2d 629, 631 (1952).

■ Celotex contends that Campus and Fort failed to meet the burden of proof for punitive damages. The jury disagreed with Celotex, and so does this court. In South Carolina, "a corporation is liable to respond in exemplary damages for the misconduct of an agent . . .". *Palmer v. Railroad*, 3 S.C. 580, 597–600 (1872); *Johnson v. Atlantic Coastline R.R.*, 142 S.C. 125, 140 S.E. 443 (1927). The evidence is capable of the inference that the corporation, through the acts of its agents, knew of the defective nature of Bond Ply yet continued to sell the material because of its profitability. The evidence presented at the trial also established that Celotex engaged in fraudulent misconduct, failed to test its product adequately, represented Bond Ply to have a given longevity even though Celotex knew it did not, and failed to warn consumers of product defects. Furthermore, the jury found Celotex guilty of a conscious disregard of its duty by failing to test Bond Ply before putting it on the market. This finding of gross negligence imposed upon the jury a duty to return a verdict of punitive damages. *Sample v. Gulf Refining Co.*, 183 S.C. 399, 191 S.E. 209 (1937); *Dagnall v. Southern Ry.*, 69 S.C. 110, 48 S.E. 97 (1903); *Beaudrot v. Southern Ry.*, 69 S.C. 160, 48 S.E. 106 (1904). In light of the above, this court finds that punitive damages were proper in this case.

This conclusion is supported by the traditionally high standard to which the South Carolina Supreme Court has held sellers. As the Fourth Circuit Court of Appeals has commented:

---

**121.** *Genay*, in which the plaintiff became ill after consuming a glass of wine containing a large quantity of Spanish fly that the defendant

had added as a practical joke, appears to be the first reported punitive damages decision in this country.

. . . The pronouncements on products liability emanating from the highest court of [South Carolina] clearly demonstrated a desire to protect consumers and correspondingly to impose stringent duties on sellers.

*Smith v. Regina Mfg. Corp.*, 396 F.2d 826, 827–9 (4th Cir. 1968).

Assuming that the standard for punitive damages was met, Celotex contends that the verdicts are so grossly excessive as to show that the jury was motivated by passion, partiality, or prejudice, and that this requires a new trial. *Aaron v. Hampton Mtrs., Inc.*, 240 S.C. 26, 124 S.E.2d 585 (1962); *Mork v. Atlantic Coastline Ry. Co.*, 227 S.C. 245, 87 S.E.2d 830 (1955); *Vernon v. Atlantic Coastline Ry. Co.*, 221 S.C. 376, 70 S.E.2d 862 (1952). In deciding whether or not the awards of $500,000 and $125,000 are excessive, this court must inquire into the function which punitive damages are intended to serve.

Probably the classic analysis of punitive damages was undertaken by Professor Clarence Morris almost fifty years ago in his law review article entitled, "Punitive Damages in Tort Cases." [122] Morris stated that one of the principal reasons for extracting compensatory damages from the defendant is to admonish him and others not to engage in similar conduct in the future. Since the admonishment is only effective where the conduct is capable of being corrected, damages are only awarded where there has been negligence or fault, rather than reasonable conduct which had an unforeseeable result.[123] However, as the name indicates, compensatory damages simply compensate: they do not take the defendant's wealth or other factors into consideration. Therefore, the advent of exemplary damages provided a much better tool for fine tuning the proper admonition which a particular defendant needs.

■ It must be noted that deterrence and warnings to others are not the only purposes which punitive damages serve in South Carolina. The cases speak in terms of vindicating a private right. In other words, punitive damages serve as a type of private revenge which is carried out in the courts rather than through duels or in back alleys. *Watts v. South Bound R. Co.*, 60 S.C. 67, 38 S.E. 240 (1900); *Beaudrot v. Southern R. Co.*, 69 S.C. 160, 48 S.E. 106 (1904); *Davenport v. Woodside Cotton Mills Co.*, 225 S.C. 52, 80 S.E.2d 740 (1954). In *Johnson v. Atlantic Coast Line Railroad Co., et al.*, 142 S.C. 125, 140 S.E. 443, 447 (1927), the South Carolina Supreme Court said:

Compensatory damages relate mainly to the situation of the injured party. * * * Exemplary damages have relation to the injured party in only one respect, to vindicate his right, recklessly, willfully, maliciously, or wantonly invaded. * * * One of the chief purposes in awarding damages of this class is to punish the wrongdoer, not only to prevent by him a recurrence of the wrongful act, but to deter others from conduct of the same or similar kind. They are not intended for the sole good of the injured party.

Punitive damages also serve to compensate the victim for his attorneys' fees, which are normally taken out of his compensatory damage verdict, and for other expenses for which the jury does not award compensatories. See, *Mock v. Atlantic Coastline R. Co.*, 227 S.C. 245, 267, 87 S.E.2d 830, 840 (1955); Owen, *Punitive Damages in Products Liability and Litigation*, 74 Mich. L.Rev. 1258, 1295 (1976).

In the ascertainment of punitive damages, there is no exact monetary standard which can be used as a measure. *Johnson v. Atlantic Coast Line Railroad Co., et al.*, 142 S.C. 125, 140 S.E. 443 (1927). There is no formula for punitives as the amount to be awarded is peculiarly within the judgment and discretion of the jury, subject to

---

122. 44 Harv.L.Rev. 1173 (1931).

123. Of course, with the advent of strict liability in tort, *Restatement* 2d, Torts, § 402a, the modern function of damages has been expanded to

cover the fairer loss distribution by an innocent manufacturer as compared to an innocent consumer or victim. See S.C.Code Ann. §§ 15–73–10 *et seq.* (1976).

the supervisory power of the trial judge over jury verdicts. *Gilbert v. Duke Power Co.*, 255 S.C. 495, 179 S.E.2d 720, 723 (1971). The main things to be considered are the character of the tort committed, the punishment which should be meted out therefor, and the ability of the wrongdoer to pay. *Johnson*, 140 S.E. at 453.

 In the instant case, the verdict certainly does not indicate prejudice, caprice or passion. Nor does it indicate undue liberality on the part of the jury. Nowhere in the action was there any evidence of undue haste or submission to passion or prejudice. The verdicts which the jury brought in, although large when seen in a vacuum, were much smaller than the liberal South Carolina approach to products liability might have allowed as a deterrent against future proscribed actions on the part of Celotex and other corporations like it. Clearly, Jim Walter Corporation (Celotex) is in no danger of bankruptcy.

 The admonitory function of punitive damages does not lend itself to formulation. For one thing, a survey of South Carolina cases indicates that there has never been an agreement on ratios. There is no definite mathematical rule as to the proportion which punitive damages should bear to actual damages. *Eaddy v. Greensboro-Fayetteville Bus Lines*, 191 S.C. 538, 5 S.E.2d 281, 283 (1939). In the case of *Perry v. United Ins. Co. of America*, 262 S.C. 351, 204 S.E.2d 573 (1974), the Supreme Court affirmed the jury verdict awarding $86.10 actual damages and $5,000.00 punitive damages in a fraudulent conversion case. In a case where South Carolina specifically rejected the application of a ratio rule which would require limitation upon the amount of punitive damages, the ratio of actual damages to the punitive damage award was approximately 1:4, greater than in this suit. *See, e. g., Rogers v. Florence Printing Co.*, 233 S.C. 567, 106 S.E.2d 258 (1958). On the other hand, nothing would prevent a jury from giving greater actual damages than punitive damages. *See, e. g., Cammer v.*

*Atlantic Coast Line Ry. Co.*, 214 S.C. 71, 51 S.E.2d 174 (1948) ($25,000 actuals; $5,000 punitives).

 The refusal to specify a ratio is due to the need to individualize punitive damage verdicts. One must look to behavior, not to results, to determine the need to admonish, and one must look to the wealth of the defendant to determine the amount which must be awarded to accomplish that result. *Patterson v. Bogan*, 261 S.C. 87, 198 S.E.2d 586, 590 (1973).

Although the many purposes punitive damages serve are very relevant to the public policy issue of punitive damages in multiple plaintiff cases, the deterrence function serves as the basis for limiting damages.[124] If one were to award punitive damages solely on the basis of revenge, there would be no limit on the amount of punitives which could justifiably be awarded. However, it is well-known that the purpose of punitives is not to "bankrupt" a defendant, but simply to deter him and others from similar conduct in the future. *Collins v. Brown*, 268 F.Supp. 198 (D.C.D.C. 1967); *Herman v. Hess Oil Virgin Islands Corp.*, 379 F.Supp. 1268 (Vir.Is.Dist.1974); *Wynn Oil Co. v. Purolator Chem. Corp.*, 403 F.Supp. 226 (M.D.Fla.1974); *Holmes v. Hollingsworth*, 234 Ark. 347, 352 S.W.2d 96 (1961); *Levine v. Mills*, 114 A.2d 546 (D.C. Mun.App.1955); *Miller v. Schnitzer*, 78 Nev. 301, 371 P.2d 824 (1962); *Town of Jackson v. Shaw*, 569 P.2d 1246 (Wyo.1977). Thus the extent of the defendant's wealth constitutes a limit on the amount of damages which can be awarded. *Patterson v. Bogan*, 261 S.C. 87, 198 S.E.2d 586, 590 (1973). Further, lowering the award of damages depends on the type of conduct involved. *Patterson, supra.* Certainly the conduct of an automobile manufacturer who calculates that it is more profitable to pay off wrongful death and personal injury claims than to modify a fuel compartment which is known to be defective, is more heinous than the conduct involved here which did not threat-

---

124. See "Developments in the Law—Corporate Crime; Regulating Corporate Behavior Through Criminal Sanction," 92 *Harv.L.Rev.* 1227, 1370 (1979).

en the lives of anyone involved, nor did it reach the coldblooded calculation of the automobile manufacturer's accountants and engineers. Nonetheless, there are many decisions which have awarded punitive damages for property damage. *See e. g., Boehm v. Fox*, 473 F.2d 445 (10th Cir. 1973); *Standard Oil Co. v. Gunn*, 234 Ala. 598, 176 So. 332 (1937); *Boise Dodge, Inc. v. Clark*, 92 Idaho 902, 453 P.2d 551 (1969); *Johnson v. Allen*, 448 S.W.2d 265 (Mo.App.1969); and *Craig v. Spitzer Motors*, 109 Ohio App. 376, 160 N.E.2d 537 (1959).

What incentives are there in the marketing situation which would motivate Celotex to change its behavior? Of course, there are none now, because Celotex has taken Bond Ply off the market. However, it may be that the jury felt it necessary that Celotex and others know that marketing decisions of the type made here will not be tolerated in the future.

The evidence indicates that from 1964 through 1972 and 1973 when the product was taken out of its manual, Celotex produced almost two billion square feet of Bond Ply.[125] The profitability of this product was, in a ball park figure, approximately twice that of the regular four-ply system of which it was sold as the equivalent.[126] It does not take much imagination to realize that accountants would have little trouble in justifying the continued marketing of this product if the only deterrent were to be compensatory damages. For one thing, many consumers would never file a suit even if their roofs were defective. For another, many of the suits filed would never reach the verdict stage but would be settled for a compromised figure.

Until the product acquired a reputation which forced it to be removed from the market, there would be little or no incentive to prevent the marketing of defective products. It is in precisely this situation, where market conditions and compensatory damages are inadequate to deter the marketing of a defective product, that punitive damages serve their greatest function. *Doralee Estates v. Cities Service Oil Co.*, 569 F.2d 716, 723 (2d Cir. 1977).

Punitive damages add an "open-ended" factor to the equation which company officials must take into consideration.[127] A manufacturer will be aware of the profitability of his product but will be unable to determine whether his potential liability will range from thousands to millions to even tens of millions of dollars. Logically, this forces a prudent manufacturer intent on maximizing profits to hesitate before marketing a known defective product, or an untested product. Furthermore, by absorbing many of the profits which were made from producing products with less testing and fewer safety measures, punitive damages help to prevent decisions which dilute safety measures.

Thus, it becomes clear in this situation that the inclination on the part of a manufacturer to change his behavior is largely determined by the prospect of punitive damages. Were the $500,000 and $125,000 verdicts greater than those which were needed to accomplish this purpose? This court thinks not. At the trial, attorneys for defendant stipulated that the net worth of Jim Walter Corporation, of which Celotex is a wholly owned subsidiary, was $1,500,000,-000.00 ($1.5 billion).[128]

After subtracting the liabilities from this gross asset figure, the parties stipulated that the net worth was $538,115,000.00 based on the most recent annual report of the Jim Walter Corporation available in the courtroom. The comparison of the verdict of $500,000 with the net worth of the defendant, produces a ratio of 1:1,000 or 1/10th of 1 per cent of that net worth. The $125,-

---

125. Transcript, page 1014.

126. Transcript, page 2023.

127. *Doralee Estates v. Cities Service Oil Co.*, 569 F.2d 716, 723 (2d Cir. 1977).

128. Plaintiff originally requested financial data on Celotex Corporation. However, attorneys for defendant were unable to provide this information. Therefore, it was stipulated that the net worth of the Jim Walter Corporation would serve as a basis for punitives. Transcript at 2260.

000 verdict produces a ratio of 1:4,000 or 1/40 th of 1 per cent of the net worth. If a verdict of similar proportion were rendered against a financially well-to-do citizen with a net worth of $100,000, the amount of punitive damages to Campus would be $100, and the amount to Fort would be $25.

The frequently quoted rule is "that for a verdict to be excessive it must be so much so as to strike mankind, at first blush as being beyond all measure, unreasonable, outrageous ... or extravagant for the court to undertake to draw the line for it has no standard by which to ascertain the excessiveness." *Haselden v. Atlantic Coastline R. Co.*, 214 S.C. 410, 53 S.E.2d 60, 66 (1949). These verdicts hardly reach the level which would make mankind blush. The jury deliberated two days before bringing in these verdicts, and this court would note that during the trial the jurors were unusually attentive.

### Punitive Damages In Products Liability Litigation

■ Initially, Celotex challenges the punitive damages award under the Commerce Clause, the Due Process Clause, the Cruel and Unusual Punishment Clause of the Eighth and Fourteenth Amendments, and the Double Jeopardy Clause of the Fifth and Fourteenth Amendments. None of these arguments were raised at the directed verdict stage of trial; consequently, none

can be raised by motion for judgment n. o. v. which is but a renewal of a motion for directed verdict. *House of Koscot Development Corp. v. American Line Cosmetics, Inc.*, 468 F.2d 64 (5th Cir. 1972). *Glazer v. Glazer*, 374 F.2d 390 (5th Cir. 1967), *cert. denied*, 389 U.S. 831, 88 S.Ct. 100, 19 L.Ed.2d 90 (1967). Moreover, none of Celotex's grounds in its new trial motion is sufficiently specific. *Harkins v. Ford Motor Co.*, 437 F.2d 276 (3d Cir. 1970). Celotex's assignments of error in its motion for a new trial make no mention of any constitutional issues arising out of the award of punitive damages; rather these issues were raised for the first time by brief, more than three months after service of the motion for new trial. In any event, the contentions of a constitutional nature which are now being raised by memorandum constitute new grounds. They were not embodied in the form of any request to charge; nor were they presented as an objection to the charge given to the jury. In short, they are now appearing for the first time. A new trial should not be granted on the basis of a theory which was not urged at trial although it could have been. *Palmer v. Stokely*, 259 F.Supp. 776 (D.C.Okl.1966). The purported constitutional bases should not be permitted as grounds at this stage for the motion for a judgment n. o. v. or, in the alternative, for the motion for a new trial.[129]

129. In any event, this court is not persuaded by the constitutional principles which Celotex draws upon: that its business in interstate commerce should not be subjected to a risk not imposed on intrastate commerce; that the doctrine of punitive damages suffers from an unconstitutional "vagueness" in that it does not have notice of the proscribed conduct; that multiple punitive damage awards constitute "cruel and unusual" punishment; and that it is placed in double jeopardy by the prospect of multiple awards.

Assuming, *arguendo*, that the Commerce Clause, multiple taxation cases relied upon by Celotex can be used to test punitive damage awards, the awards were, as noted earlier, were in no way proven to be oppressive or unreasonable or a burden on interstate commerce. *Bibb v. Navaho Freight Lines, Inc.*, 359 U.S. 520, 79 S.Ct. 962, 3 L.Ed.2d 1003 (1959) *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970).

Nor does Celotex's due process claim possess merit. The imposition of punitive damage awards, though penal in nature, does not approach the severity of criminal sanctions. See Friendly, *Criminal Safeguards and the Punitive Damage Defendant*, —— U.Chi.L.Rev. 408 (1966). Indeed, the act of awarding compensatory damages is also somewhat penal in nature. *Punitive Damages*, 41 N.Y.U.L.Rev. 1158, 1178 (1966). Finally, Celotex has had the benefit of 200 years of South Carolina decisions detailing standards of behavior which will give rise to punitive damages.

In arguing that successive punitive damage verdicts subject it to cruel and unusual punishment, Celotex relied upon a suggestion in a concurring opinion by Justice Frankfurter that the Eighth Amendment could protect a defendant against multiple civil penalties. *United States v. Hess*, 317 U.S. 537, 556, 63 S.Ct. 379, 390, 87 L.Ed. 443 (1942). However, the Su-

This court is convinced of the efficacy of punitive damage awards in products liability cases. However, this is not to say that there have not been concerns voiced with this approach. Celotex has discussed at length the "overkill" argument.

In one of the early cases to deal with this subject, *Roginsky v. Richardson-Merrell, Inc.*, 378 F.2d 832 (2d Cir. 1967), Judge Friendly in some very perceptive *obiter dicta* raised many of the fears of using punitive damages in this area. *Roginsky* was one of several hundred cases brought against a drug manufacturer for personal injuries, including cataracts, attributed to defendant's anti-cholesterol drug MER/29. Evidence at the trial revealed grievous misconduct on the part of defendant in the marketing of this drug, including inadequate testing, suppression of unfavorable test results, intentional misrepresentations to the FDA, and continued marketing of the drug in spite of known serious and injurious side effects. Judge Friendly discussed the impracticability of limiting the amount of punitive damage recoveries where hundreds of plaintiffs sue a defendant with each plaintiff claiming punitive damages in his different case. Also, Judge Friendly noted that products liability insurance blunts the deterrent effect of damages, thus undercutting the rationale for punitives in the first place. He also raised the question of whether the innocent shareholder should suffer for the sins of management. Finally, Judge Friendly noted that the court should be careful not to chill the development of new products.

*Roginsky* has indeed pointed out many of the problems which accompany awards of punitive damages where there are multiple plaintiffs. However, it should be remembered that Judge Friendly was a pioneer in this area, looking ahead to an uncertain future, which contained uncertain fears.[130] Twelve years have now passed, and many of the fears expressed by Judge Friendly have simply not been realized. Based on the wisdom of experience, a court which might have been hesitant to assess punitive damages in 1967, might well be willing to do so in 1979. In fact, the Second Circuit, in an opinion joined by Judge Friendly some 10 years later, affirmed an award of $200,000 punitive damages against an oil company arising out of a large oil spill, a situation which might result in multiple plaintiffs. *Doralee Estates v. Cities Service Oil Co.*, 569 F.2d 716 (2d Cir. 1977). Other cases allowing punitive damages in a potential multiple plaintiff situation are: *Gillham v. Admiral Corp.*, 523 F.2d 102 (6th Cir. 1975) ($100,000 punitive and $50,000 attorney's fees); *Hoffman v. Sterling Drug, Inc.*, 485 F.2d 132 (3rd Cir. 1973) (reversing lower court which refused to submit punitive damage issue to the jury); *Drake v. Wham-O Mfg. Co.*, 373 F.Supp. 608 (E.D. Wis.1974) (trial court refused to strike request for punitive damages).

This court is unconvinced that the "specter of overkill" is anything more than just that—an unrealized phantom or mental image. Moreover, the supervisory power of trial courts over jury verdicts would be sufficient in any event to prevent such an occurrence.

Many suggestions have been advanced to avoid this theoretical fear.[131] However, the

---

preme Court has recently ruled that the Eighth Amendment is generally limited to the conditions of a criminal sentence. *Ingraham v. Wright*, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977). Therefore, this court finds that the Eighth Amendment would not apply here.

Finally, Celotex is not subjected to double jeopardy since each event would constitute a separate "offense."

**130.** Two months after the *Roginsky* decision setting aside punitive damage in that the evidence was insufficient to warrant a finding of recklessness required under New York law for such an award, the California courts, upon the same set of facts concerning the development of MER/29, approved an award of $250,000 punitive damages under California law. *Toole v. Richardson-Merrell, Inc.*, 251 Cal.App.2d 689, 60 Cal.Rptr. 398, 29 A.L.R.3d 988 (1967).

**131.** One suggestion has been that each plaintiff be apportioned his proper share of the total amount of punitive damages which should be awarded. This approach has the support of taxation cases decided on the basis of the Commerce Clause, involving the wrongful taxation of property of interstate companies. There

problem with these suggestions is that the legal principles do not exist to require that all cases be treated in the suggested manners. While it may be that Congress and the State legislature should address the situation, the suggested procedures are neither necessary nor available to this court in this case.

## MOTIONS FOR COSTS AND ATTORNEYS' FEES

Defendants Kahn and Fort have pending motions before this court, seeking a determination of their entitlement to attorneys' fees and costs in connection with the defense of this action. Kahn filed a cross-claim against Celotex seeking indemnity for any money owed to Campus.[132] According to Kahn, included in this indemnity action were damages in the form of attorneys' fees. Fort successfully prosecuted a cross-action against Celotex for fraud and specifically sought attorneys' fees incurred as a result of this action.[133] Counsel for Fort, Kahn, and Celotex agreed to remove this issue from the province of the jury, preferring that the court decide the issues of entitlement and amount. A review of the briefs and the law pertaining to this issue has convinced this court that Kahn and Fort are, in fact, entitled to partial reim-bursement for their costs and attorneys' fees. However, due to the lack of information before this court concerning the amount of such costs and fees, the parties will be requested to submit affidavits of costs, expenses and fees to the court for approval, subject to the objection of defendant Celotex as to the amount.

It is generally held that where the wrongful act of one party has involved another in litigation with a third party, or placed them in such relation to a third party as to make it necessary for him to incur legal expenses to protect his interest, such should be treated as the legal consequences of the original wrongful act and may be recovered as damages. 45 A.L.R.2d 1183, 1187 (1956). Specifically, in actions of indemnity, where the duty to indemnify is either implied by law or arises under contract, reasonable attorneys' fees incurred in resisting the claim indemnified against may be recovered as part of the damages and expenses. 22 Am.Jur.2d *Damages* § 166 (1965).

In this diversity case, the parties rely principally upon *Addy v. Bolton*, 257 S.C. 28, 183 S.E.2d 708 (1971), which is the leading South Carolina case concerning the right to attorneys' fees for defending an action where a third party is held responsi-

---

states were allowed to apportion the amount of property within their state and to tax their portion. *Pullman's Palace Car Co. v. Commonwealth of Pa.*, 141 U.S. 18, 11 S.Ct. 876, 35 L.Ed. 613 (1891). However, the problem with this approach to punitive damages is that there is no given amount from which to apportion the shares. Also, there is the interest of society in striking the defendant hard with the first bite, since later cases may not reach a verdict.

Suggestions have come from many sources that punitive damages and multiple claims cases should be handled in class actions, but the complexities of this approach are no less than the ordinary complexities of Rule 23, Federal Rules of Civil Procedure, as they now exist. Another suggestion is that plaintiffs should be forcibly joined in one action in order that the jury might consider the proper amount of total damages, thus avoiding the danger of "overkill" in successive suits. Yet another proposal has been to have a double trial whereby, after liability is found which would give rise to punitive damages, the jury is given further facts such as the wealth of the company, pre-ceding verdicts, and other information which is necessary to a fair assessment of punitive damages. Perhaps the well-accepted double trial in a death penalty case could act as a prototype.

**132.** Kahn's "Answer to Amended Complaint and Amended Crossclaim," filed March 22, 1977, stated ". . . and if this Defendant [Kahn] should be found liable to plaintiff therefor, then this defendant is entitled to indemnification against the defendant Celotex Corporation in the amount of such judgment, if any; together with this defendant's costs and attorneys' fees *in defending this action.*

**133.** In its cross-claim for fraud, filed March 15, 1977, Fort states in paragraph 14, "That due to the failure of the Campus Sweater and Sportswear roof, this defendant has incurred substantial injury to its reputation as a quality roofer, has lost time in investigating and defending this law suit, has incurred expense to undertake an investigation of the cause of this roof failure and *substantial attorneys' fees and expense.*

ble. Bolton and others owned a building in Greenwood which they leased to Addy to operate as a jewelry store. Bolton hired C. Y. Thomason Co., a general contractor, to make repairs to the building. During the course of the repairs, and allegedly due to Thomason's negligence, a fire was started which damaged the merchandise of the lessees. The lessees then brought suit against both the owner/lessor and the general contractor, alleging their joint negligent, careless and reckless acts. In his answer, the owner alleged the sole negligence of the contractor and filed a cross-action against the contractor for indemnification, costs and attorneys' fees. A trial court directed a verdict against the owner on its cross complaint, and the jury returned a verdict against the contractor only, thereby exonerating the owner from liability. On appeal, the issue was whether the owner was entitled to recover his costs and attorneys' fees incurred in the successful defense of the action because they were put to the necessity of defending themselves against the lessee's claim by the tortious conduct of the contractor, or by his breach of contract. The South Carolina Supreme Court answered the question in the affirmative.

Quoting from the Am.Jur.2d article on damages cited above, the *Addy* court said to recover attorneys' fees and costs, a party must meet three requirements: (1) that it became involved in a legal dispute either because of the other party's breach of contract or its tortious conduct; (2) that the dispute was with a third party; and, (3) that attorneys' fees were incurred. The court stated, "We conclude that in actions of indemnity, brought when the duty to indemnify is either implied by law or arises under contract, and no personal fault of the indemnitee has joined in causing the injury, reasonable attorneys' fees incurred in resisting the claim indemnified against may be recovered as part of the damages and expenses." 183 S.E.2d at 710.

Celotex interprets *Addy* as embracing the minority view that where a defendant has been initially charged with his own independent acts of negligence, he is not entitled to recover his attorneys' fees incurred in the defense of such charge from the co-defendant ultimately held liable to the plaintiff for all damages sustained. *Leingang v. Bottled Gas Corp.,* 332 F.2d 959 (7th Cir. 1974),[134] *Krug v. Sterling Drug, Inc.,* 416 S.W.2d 143 (Mo.1967).[135] However the facts of *Addy* indicate that the court intended to adopt the majority view. The complaint in that action alleged independent acts of negligence on behalf of both the defendant owner/lessor and the defendant contractor. Paragraph 8 of their complaint, alleged that plaintiff's damages were caused by the "joint and concurrent" negligence of the defendants. Paragraph 8 then goes on to allege negligence in "employing and/or engaging unskillful agents, servants and employees to undertake making said repairs ....". and "employing agents and servants to undertake said repairs that were inherently dangerous ...". These allegations were sufficient to charge the owner

**134.** *Leingang* was a personal injury action brought against an installer of liquid petroleum cylinders for failure to odorize the gas, resulting in plaintiff's injuries. Defendant installer brought a third party action against the supplier of the gas. Upon settlement of the case, the installer petitioned the court for assessment of attorneys' fees against the supplier, and the court did so. In reversing the court's award of such counsel fees against the supplier, the Seventh Circuit concluded that so long as the installer was defending a part of its own *alleged* tort, it would not be entitled to attorneys' fees against the supposedly solely corporable co-defendant. 332 F.2d at 963.

**135.** In *Krug,* plaintiff brought an action against a pharmacist and drug manufacturer for injuries to her eyes caused by a defective eye wash. At the conclusion of the evidence, the trial court directed a verdict for the pharmacist and a judgment was entered against the manufacturer for the full amount of damages. The pharmacist appealed as to the denial of its cross-claim for attorneys' fees and the expenses of litigation, and the Missouri Supreme Court affirmed the denial of counsel fees. The Court noted that plaintiff alleged a specific independent act of negligence against the pharmacist and that it would be unjust and unwarranted to require the co-defendant manufacturer to bear the costs of the pharmacist defending its own alleged actions of negligence. 416 S.W.2d at 156.

with negligence in hiring an alleged incompetent contractor, which would constitute an independent act of negligence alleged against the owner.[136] In spite of this, the court allowed recovery of the costs and attorneys' fees.

The basic theory of *Addy* was that attorneys' fees should be treated as legal consequences of the original act and therefore could be recovered as damages, provided three requirements were met. However, a close reading of *Addy* reveals certain additional requirements which are basically procedural in nature. Because attorneys' fees are treated as damages resulting from the original wrongful act, *Addy* requires that the amount of attorneys' fees be proved in court, a procedure which is entirely different from that of requiring the trial judge to award attorneys' fees. Thus, instead of the judge awarding fees according to statutory formulas, as in civil rights actions, the injured party must come forward with proof as to the *amount* of damages he is entitled to. A consequence of this approach is that there must be an action existing in which attorneys' fees have been claimed. But this court does not read *Addy* as requiring the injured party to bring an indemnity action in a different court at a different time, since to do so would be an inefficient use of judicial time and energy, as well as a burden on the parties. It seems clear that damages in the form of attorneys' fees can be awarded in a cross-claim which is joined with the original action. South Carolina law is also clear in refusing attorneys' fees to a party who occupies a plaintiff's position. *Townsend v. Singleton*, 257 S.C. 1, 183 S.E.2d 893 (1971); *Rimer v. State Farm Mut. Auto. Ins. Co.*, 248 S.C. 18, 148 S.E.2d 742 (1966); *First National Bank of Chillicothe v. McSwain*, 93 S.C. 30, 75 S.E. 1106 (1912). While it is just to recompense one for expenses which are imposed upon an innocent party by the action of another party in prosecuting a suit, a party who chooses to bring a suit stands on entirely different footing. Finally, the *Addy* court added the proviso from the case of *Atlantic Coast Line R.R. Co. v. Whetstone*, 243 S.C. 61, 132 S.E.2d 172, that no personal negligence of the claiming party may have joined in causing the injury.

■ Applying the above principles to this case requires breaking Fort's involvement down into three separate actions. First, plaintiff Campus prosecuted an action against Fort which was dismissed at the close of plaintiff's case. Although Celotex argues that the nonsuit awarded against plaintiff means that Campus simply failed to prove its case, this court is of the opinion that Fort is entitled to the attorneys' fees incurred in the defense of this action. The final verdict of the jury found Celotex to be the cause of the roof failure, not Fort. Thus the nonsuit in combination with the jury verdict is sufficient evidence that Fort's negligence did not contribute to the damages. In the second action, Fort prosecuted a cross-claim against Celotex in which Fort occupied the position of plaintiff. The expenses incurred as a result of that action, of course, would not be compensable under South Carolina law. Finally, defendant Kahn prosecuted a cross-claim for indemnity against Fort for which Fort incurred expenses in defending. This court finds costs and attorneys' fees to be the proximate result of Celotex's actions which should be recoverable. In light of Fort's specifically seeking attorneys' fees in its fraud action against Celotex, Fort was in a proper procedural position to allege and prove its damages.

■ Due to the joinder of the various claims, defendant Kahn occupied the position of defendant in one action and plaintiff in another. Those expenses which were incurred as a result of the defense of the implied warranty action by plaintiff, which was dismissed at the end of all of the evidence, represent recoverable costs. The same finding must be made in regard to the

---

**136.** Unfortunately, *Addy* seems to make entitlement a jury question, subject to a ruling by the trial court that the damages are too remote, as a matter of law, to be caused by defendant's tortious conduct. The parties in this case probably followed the wiser course by removing these technical and confusing issues from consideration by the jury.

negligence and express warranty actions prosecuted by Campus against Kahn, since the jury's final verdict found that Celotex was at fault, thus negating the possibility of negligence on the part of Kahn. However, as in the case of Fort, Kahn may not recover damages for the prosecution of its indemnity action against Fort and Celotex where it occupied the position of plaintiff. Finally, although Kahn's indemnity cross-claim did not expressly mention attorneys' fees, it did seek indemnity for damages incurred as a result of Celotex's tortious and wrongful conduct, of which attorneys' fees are a part. As such, the procedural requirements for prosecuting an indemnity action for attorneys' fees have been met, and an award is proper in this case.

In summary, it is the conclusion of this court that defendants Fort and Kahn are entitled to costs and attorneys' fees as a result of defending their actions in this case. The parties are hereby directed to provide this court with affidavits of costs, expenses and fees, upon which this court will act, subsequent to the filing of any objections as to the amount by defendant Celotex.

## CONCLUSION

This court finds that the evidence at trial was sufficient to support the findings of the jury. Any errors which occurred, as they always will at trial, were not so great as to prejudice Celotex's right to a fair trial. Due to a clear error on the record, the jury's award to Campus for actual damages must be reduced by $26,413.34 or a new trial granted. Plaintiff is directed to file a remittitur in the appropriate amount. If this remittitur is not filed with the court, a new trial will be granted. In that the two punitive damage awards were neither excessive nor unconstitutional, the motions as to these verdicts are denied.

AND IT IS SO ORDERED.